1  Ilene F. Brookler Bar #269422
   GREENFIELD & GOODMAN, LLC
2  250 Hudson Street, 8th Floor
   New York, NY 10013
3  Tel: (917) 495-4446
   Fax: (212) 355-9592
4  ibrookler@gmail.com

5  Rose F. Luzon #221544
   SHEPHERD, FINKELMAN,
6  MILLER & SHAH, LLP
   One California Street
7  San Francisco, CA 94111
   Tel: (415) 429-5272
8  Fax: (866) 300-7367
   rluzon@sfmslaw.com
9
   *Attorneys for Plaintiff*
10
   [Additional Counsel on Signature Page]
11
12           **UNITED STATES DISTRICT COURT**
    **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

13  **A. J. COPELAND**, Individually and
    Derivatively on behalf of
14  **HEWLETT-PACKARD COMPANY,**

15  Plaintiff,

16              v.                                    Civil Action No.

17  **LEO APOTHEKER; MARGARET C.**
    **WHITMAN; RAYMOND J. LANE; MARC**
18  **L. ANDREESEN; SHUMEET BANERJI;**          **COMPLAINT**
    **RAJIV L. GUPTA; JOHN H. HAMMERGREN;**
19  **ANN M.LIVERMORE; GARY M. REINER;**
    **PATRICIA F. RUSSO; G. KENNEDY THOMPSON;**
20  **RAYMOND E. OZZIE; JAMES A. SKINNER;**
    **ROBERT R. BENNETT; RALPH V. WHITWORTH;**
21  **and MICHAEL R. LYNCH,**

22  Defendants,
                   and
23
    **HEWLETT-PACKARD COMPANY,**
24
    Nominal Defendant.
25

26

27

28

                          COMPLAINT                              1

## NATURE OF THE ACTION AND SUMMARY OF THE CLAIMS

1.     This is a shareholder's action brought by Plaintiff, individually, as well as derivatively on behalf of Nominal Defendant Hewlett-Packard Company ("HP" or the "Company").  No claims are asserted herein against HP.

2.     Defendants Marc L. Andreesen, Shumeet Banerji, Rajiv L. Gupta, John H. Hammergren, Raymond J. Lane, Ann M. Livermore, Gary M. Reiner, Patricia F. Russo, G. Kennedy Thompson, Margaret C. Whitman, Ray Ozzie, Jim Skinner, Robert R. Bennett, Ralph Whitworth and Leo Apotheker ("the Board Defendants"), each of whom is or was serving on the Company's well-compensated Board of Directors ("Board"), collectively and individually, initiated and/or actively participated in a course of conduct that was designed to, and did:

(a)     Conceal the fact that the Company's management was improperly misrepresenting HP's internal controls in order to allow a widespread scheme of overseas bribery, kickbacks and other behavior in violation of applicable federal and other laws, and, thereafter, cover-up such wrong doing;

(b)     Fail to comply with, and thus violate, the books and records, and internal controls provisions of the Foreign Corrupt Practices Act (the "FCPA") and conceal such violations;

(c)     Fail to make timely and voluntary disclosure of HP's violations to the Securities and Exchange Commission ("SEC") and the United States Department of Justice ("DOJ") in order to, *inter alia*, mitigate the fines and penalties to which HP is now subject;

(d)     "Stonewall" investigators of the DOJ, the SEC and otherwise, despite knowing the Company committed illegal acts;

(e)     Deceive the investing public, including shareholders of HP, regarding the Board Defendants' management of the Company's operations through and including the date of this Complaint;

(f) Fail in their most fundamental stewardship responsibilities owed to HP by providing superficial and perfunctory services as directors;

(g) Cause the issuance and dissemination of HP's 2013 and 2014 Proxy Statements, which were false and misleading;

(h) Recklessly pursue acquisitions without adequate investigation and pay unjustifiably excessive prices in connection therewith, including, *inter alia*, the disastrous acquisitions of Autonomy Corporation ("Autonomy") for approximately $11.7 billion, most of which investment had to be written off a year later; the acquisition of Electronic Data Systems ("EDS") in 2008 for $13.9 billion, of which more than $8 billion of its supposed value had to be written down; and the reckless acquisition of 3Par on September 27, 2010 for $2.3 billion plus other expenses; and fail to take any action against those responsible for these acquisitions;

(i) Violate federal disclosure laws, causing the Company to be sued by defrauded investors and otherwise;

(j) Fail to comply with a succession plan resulting in the reckless hiring and firing of Defendant Apotheker, HP's third fired CEO in a row, and the reckless hiring of Defendant Whitman;

(k) Permit the expiration of statutes of limitation applicable to claims possessed by the Company without investigating such claims or obtaining agreements tolling the running of statutes of limitations;

(l) Retain Andrew Levander, Esq. ("Levander"), Dechert, LLP ("Dechert") and other lawyers, purportedly to investigate shareholder demands and/or claims the Company possesses or possessed against its officers and directors with the purpose of protecting such persons from liability to HP, causing considerable waste of HP's assets; and

(m)      Retain Ralph Ferrara, Esq. and members of his firm (collectively, "Ferrara"), to investigate certain of Plaintiff's pre-suit demands on the Board, as well as certain claims alleged derivatively by HP shareholders in this Court and in state court, with no intention of acting in good faith upon the product of such investigations and Ferrara's recommendations.

3.      HP has become the subject of years-long investigations by the DOJ, the SEC and other governmental bodies arising from, *inter alia*, the payment of substantial bribes in violation of the FCPA.

4.      The Company has expended and will continue to expend significant resources and hundreds of millions of dollars to address and resolve these investigations.  It is likely that HP will be subjected to massive fines and penalties because of the underlying violations of applicable law, the "stonewalling" of the investigations by management and HP's legal counsel, and the failure to make timely voluntary disclosures of the wrongdoing.

5.      In addition to the foregoing, the Company has suffered substantial economic damages and damages to its reputation as a direct result of the wrongdoing alleged herein.  As Michael Garland, Executive Director for Corporate Governance in the New York City Comptroller's office stated, **"There's been a long series of boardroom failures that have harmed the reputation of the company and repeatedly destroyed shareholder value over an extended period of time."  (emphasis added)**

6.      These damages were magnified when, on November 30, 2011, Standard & Poor's ("S&P") cut its rating of HP debt, lowering its rating from single "A" to "BBB" plus.  In this substantial downgrade, S&P went on to state as to this formerly "blue chip" company:

> **"In addition, we have concerns that HP's inconsistent growth strategies and high levels of board of directors and management turnover have elevated the level of operational and execution risk in the near term." (emphasis added)**

7.     At the same time, Fitch's also cut HP's rating and Moody's lowered HP's credit rating from A3 to Baa1, outlook negative in November 2012.

8.     The downgrades have increased HP's borrowing costs and reduced its capacity to borrow, in addition to further damaging its reputation.

9.     This action charges the Board Defendants with using their control over HP and its corporate suffrage process in effectuating, and directly participating in or aiding and abetting, violations of §14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 14a-9 promulgated thereunder by the SEC.   Plaintiff, on behalf of HP, seeks to recover for the Company the damages caused and being currently caused to it by the Board Defendants' wrongdoing, including concealing facts and recommendations disclosed to it by Ferrara more than three weeks ago.   This action seeks, as well, fundamental improvements in HP's governance by the Board.

10.     This action also seeks the appointment of a Special Master to oversee and direct: (a) the Company's negotiations with the DOJ and the SEC with respect to the wrongdoing alleged herein, because the Board and legal counsel, due to their respective conflicts of interest, cannot conduct such negotiations consistent with their duty of loyalty to HP; and (b) HP's response to the claims herein, and as alleged in *Copeland v. Lane, et al.,* Civil Action No. 11-01058 (N.D.Cal.) and before the Ninth Circuit Court of Appeals, Case No. 13-16251 *("Copeland I"),* due to the fact that HP's counsel therein has not acted and cannot act in the Company's best interests, but instead have defended such litigation so as to protect the Board Defendants named therein from personal liability to HP, which disloyal conduct can be expected to continue in this litigation.[1]

---

[1] To the extent that facts are alleged herein which overlap with those alleged in *Copeland I*, the reason therefor is to supply appropriate context for wrongdoing. The claims alleged herein are not duplicative of those alleged in *Copeland I.*

11.     This action alleges, as well, claims on behalf of HP derivatively against Defendant Michael R. Lynch arising out of his violations of ¶10(b) of the Exchange Act in connection with the sale of Autonomy to HP.

12.     The allegations against the Board Defendants and Lynch are based upon personal knowledge as to Plaintiff and his ownership of shares of HP, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of his counsel, which included, among other things: (a) review and analysis of the Company's public filings with the SEC; (b) review of HP's 2014, 2013 and previous Proxy Statements; (c) review of other publicly available information, including articles in the news media and on blogs; (d) review of the Company's website and press releases; (e) consultation with persons knowledgeable regarding the facts and circumstances alleged herein; and, (f) review of shareholder derivative and securities class action complaints in litigation commenced against the Board Defendants and other HP present and former Board members.

13.     Plaintiff believes that substantial additional evidentiary support exists for his allegations and will surface in this litigation after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 14(a) of the Exchange Act, SEC Rules 10b-5 and 14a-9 promulgated thereunder, as well as common law.

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because Counts I , II and III assert claims for violations of §§ 10(b) and 14(a) of the Exchange Act and SEC Rules 10b-5 and 14a-9; and pursuant to the Court's supplemental jurisdiction over the common law claims pursuant to 28 U.S.C. § 1367(a). Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).  Many of the acts charged herein, including the issuance and dissemination of the proxy statement at issue and the mismanagement of HP, including the wrongdoing

referred to below, occurred, in substantial part, in this District.   In addition, the Company maintains its corporate headquarters in this District and this Division.   Upon information and belief, none of the wrongdoing alleged herein took place in Delaware, HP's state of incorporation.

16.     In connection with the acts alleged in this Complaint, the Board Defendants and Lynch, either directly or indirectly at the times they served as directors of HP, used the means and instrumentalities of interstate commerce including, but not limited to, the mails and interstate wire facilities, to carry out the wrongdoing described herein.

17.     In addition to Plaintiff's individual claims asserted pursuant to 14(a) of the Exchange Act,, this action has been commenced derivatively pursuant to Rule 23.1 of the Federal Rules of Civil Procedure. This action is not brought collusively to confer jurisdiction on this Court which it would not otherwise have.

## PARTIES

### Plaintiff

18.     Plaintiff A.J. Copeland ("Plaintiff") is a resident and citizen of California. Plaintiff owns and has continuously owned common stock in HP beneficially since 1999 and throughout all of the period of the wrongdoing alleged herein.

### Nominal Defendant

19.     Nominal Defendant HP is a corporation organized under the laws of Delaware with only nominal contacts there, principally with legal counsel and a fictitious office serving as an agent for service of process. HP's principal executive offices and corporate headquarters are located in Palo Alto, California.  HP manufactures and sells a wide range of computer, software, copying and related products throughout the world.  It holds itself out as the "world's largest technology company."  HP is a Nominal Defendant only and no claims are asserted against it. Its role in this litigation is likely to be controlled by the Board Defendants.

20.     The Company conducts its operations through multiple subsidiary companies. HP's Board of Directors and senior management exercise supervision, control, and dominion over the Company's subsidiaries activities, decisions, policies, and practices and, as such, knew and/or should have known contemporaneously of the wrongdoing alleged herein and in *Copeland I* and/or directly participated in such conduct by, *inter alia*, recklessly causing the acquisitions of 3Par, EDS, and Autonomy, as described below and/or otherwise acted contrary to HP's best interests in favor of their own, thereby breaching their duties of loyalty to HP and its shareholders.   HP's Board and senior management (including, in particular, Defendant Apotheker during his time as CEO, and Defendant Whitman during her time as CEO) set the business objectives and sales goals of all of the Company's subsidiaries and they regularly reviewed and approved their budgets and projections.

**Individual Defendants**

21.     Defendant Raymond J. Lane was HP's Executive Chairman from September 2011, when Defendant Whitman became the CEO, and essentially was a co-leader with her until his resignation as Chairman.   During his tenure, Defendant Lane restructured the Board to add seven new directors, replaced the short-tenured CEO Leo Apotheker, and led the placement of Meg Whitman, HP's current CEO.   Lane was Chairman when HP decided to acquire Autonomy, a decision that led him to resign as Chairman, but remain on the current Board as a face-saving gesture.   Lane previously served as HP's non-executive Chairman from November 2010 to September 2011.

22.     Defendant Lane also serves as Managing Partner of Kleiner Perkins Caufield & Byers ("Kleiner"), a private equity firm, and he plays a very active, "hands-on" role in connection with its investments and business operations generally.

23.     At the time Defendant Lane accepted his position as a member of HP's Board, and throughout his tenure, had multiple time-consuming business and other activities in addition to his more than full-time responsibilities at Kleiner.  In that regard, he was also a director of Quest Software, Inc., Chairman of the Board of Trustees of Carnegie Mellon University, Vice Chairman of Special Olympics International, and served on the West Virginia University's Board of Governors, all of which responsibilities required significant amounts of his available time. In addition, Defendant Lane is actively involved in a number of investments in which he is a General Partner or otherwise involved in management.

24.     Defendant Leo Apotheker is the Company's former President and Chief Executive Officer, hired by the Board, effective November 1, 2010, to oversee HP following the abrupt termination of former CEO Mark Hurd.  Defendant Apotheker was unceremoniously terminated on or about September 22, 2011, some 10 months after having taken office.  Despite having little knowledge of Apotheker at the time of his hiring, the Board rewarded him with an excessively generous employment compensation package, including lucrative and unjustified severance provisions.

25.     Defendant Apotheker is also the former Chief Executive Officer of SAP, serving in that position from November 2008 to February 2010.  According to Lawrence Ellison, CEO of Oracle Corporation ("Oracle"), while at SAP Apotheker oversaw an industrial espionage scheme that stole Oracle's software; Oracle was awarded $1.3 billion by an Oakland, California jury following an 11-day trial on November 24, 2010 and SAP's admission of guilt before its commencement.[2]  The facts and circumstances surrounding such conduct, including Defendant Apotheker's role in it, were and may still be the focus of investigations by the DOJ and the FBI, according to an August 5, 2010 filing by SAP.

---

[2] Such award has since been reduced by the Court.

26.     On October 26, 2010, Defendant Lane, before even assuming his positions with HP but consistent with his understanding that he was to protect his future colleagues on the Company's Board, referring to Defendant Apotheker's role in the alleged corporate espionage, caused HP to issue a statement that Apotheker had "limited knowledge of and role in the matter" despite the fact that Defendant Lane had no personal knowledge of the alleged wrongdoing or why Defendant Apotheker had been in hiding to prevent process servers from serving a trial subpoena upon him.

27.     Defendant G. Kennedy Thompson was elected to the HP Board in 2006 and also is a director of BNC Bancorp and a principal of Aquiline Capital Partners LLC, a private equity firm.  Defendant Thompson has been a defendant in numerous securities fraud class actions and shareholder derivative actions, some of which may be still pending. In just one of such cases, $590 million was paid on his behalf to obtain a release of the liability claims against him and other defendants. Defendant Thompson sat on the HP Board during the acquisitions of EDS, 3Par, and Autonomy, and abdicated his responsibilities to the Company during this time, while overseeing the virtual collapse of Wachovia Corporation ("Wachovia"), of which he was Chairman and CEO. Until he was *de facto* terminated by the Wachovia Board of Directors, he was not only working full-time for it but attempting to deal with Wachovia's rapidly-escalating financial meltdown, for which he was primarily responsible.[3]

28.     Defendant Gary M. Reiner has been a member of the Company's Board since January 20, 2011. At the time he became a Director of the Company, Defendant Reiner served as a Special Advisor to General Atlantic, LLC, a private equity firm. Previously, Defendant Reiner served as the Senior Vice President and Chief Information Officer at General Electric Company from 1996 until March 2010, including the period in which this formerly great American icon became almost bankrupt in 2008 due to, *inter alia,* reckless, wholly inappropriate and high-risk

---

[3] Wachovia, on the brink of collapse, was rescued pursuant to an acquisition by Wells Fargo & Company.

acquisitions (causing billions of dollars in losses), an area where Defendant Reiner had significant responsibilities.

29.     Defendant Margaret C. ("Meg") Whitman is the Board's most recent appointee to the positions of President and CEO, effective on or about September 22, 2011. Prior to her appointment, Defendant Whitman had no technology industry experience, having worked in consumer companies prior to joining HP.  At eBay, Whitman spearheaded the acquisition of Skype, handing eBay shareholders a $2.75 billion loss recognized not long after the acquisition. Workers at eBAy found her to be "divisive, disagreeable and detached."  Although any high level executive recruiter could have found a more suitable CEO candidate, Defendant Lane presented his close personal friend, Defendant Whitman, to the HP Board as "uniquely qualified."

30.     Defendant Whitman joined the HP Board in January 2011as part of Lane's efforts to "get her back on her feet" after she had lost her campaign for the California governorship.[4] Defendant Lane, who had personally contributed substantial amounts to her campaign and raised substantial sums from others, approached Whitman soon thereafter about the CEO position at HP even though Defendant Apotheker had been in his position for just a few months.

31.     After Whitman lost the 2010 election, Defendant Lane also got her a job at Kleiner, where he was Managing Partner.  Defendant Lane's advocacy of Whitman at the Company  was for his and her personal benefit and a breach of his duty of loyalty to HP.

32.     Defendant John H. Hammergren, who joined the HP Board in 2005, sat on the Board during the hiring and firing of Defendant Apotheker, the hiring of Defendant Whitman, and the acquisitions of 3Par, EDS, and Autonomy.

---

[4] She spent more of her own money on the race than any other political candidate spent on a single election in American history, spending $144 million and $178.5 million including donors' funds. Defendant Whitman lost to Jerry Brown in the November 2, 2010 election.

33.     Defendants Rajiv L. Gupta and Marc L. Andreesen, both of whom joined in 2009, sat on the HP Board during the hiring and firing of Defendant Apotheker and the acquisitions of 3 Par and Autonomy. When Apotheker joined HP, Defendants Shumeet Banerji and Patricia Russo also joined the Board.

34.     Defendant Ann Livermore was an Executive Vice President at HP. From 2004 until June 14, 2011, she led the HP Enterprise Business unit. She was replaced by Dave Donatelli, Bill Veghte and Jan Zadak since total service revenue grew just 1% despite the acquisition of EDS. After being relieved of day-to-day operations, she was elected to the HP Board. She sat on the HP Board during the acquisition of Autonomy.

35.     Defendant Raymond E. Ozzie joined the HP Board in July 2013. Ozzie is the former Chief Software Architect for Microsoft. He left Microsoft in 2010 and founded Talko, Inc., a mobile communications applications and services company.

36.     Defendant James A. Skinner joined the HP Board in July 2013. Skinner is a former vice chairman and CEO of McDonald's Corp. and is now the non-executive Chairman of Walgreen Co.

37.     Defendant Robert R. Bennett joined the HP Board in July 2013. Bennett is the former President and CEO of Liberty Media Corporation, a video and online commerce company

38.     Defendant Ralph V. Whitworth joined the HP Board in 2011. Mr. Whitworth is co-founder and principal of Relational Investors LLC, a registered investment advisor and purports to be an expert in corporate governance.

39.     The Board Defendants are named defendants solely with respect to the wrongdoing that occurred while each of them served as a director and/or officer of HP.

40.     Defendant Michael R. Lynch was the founder and CEO of Autonomy before it was acquired by HP in October 2011. Lynch earned approximately $800 million in cash by

selling his company to HP. After the acquisition, Lynch became HP's Executive Vice President of Information Management, a position he held for less than six months.

41.     As early as 2007, questions began to emerge about Autonomy's meteoric rise, high margins and revenue growth. In January 2007, the Center for Financial Research and Analysis ("CFRA") added Autonomy to its "Biggest Concerns List," due to questionable accounting classifications. The CFRA would go on to publish 14 reports questioning Autonomy's financial reporting. Numerous analysts in 2009 and 2010 questioned Autonomy's revenue recognition policy and aggressive "roll-up" acquisition strategy. By mid-2010, Autonomy's growth began showing signs of financial strain. On October 10, 2010, Deutsche Bank downgraded Autonomy to a "hold". Other analysts concluded that Autonomy's Intelligent Data Operating Layer ("IDOL") was becoming increasingly outdated. In Autonomy's third quarter 2010 conference call, Lynch specifically prohibited a follow-up questions concerning Autonomy's reported financial performance. Lynch hired Frank Quattrone to help him sell Autonomy.

## SUBSTANTIVE ALLEGATIONS

### A.     Lack of CEO Succession Plan

42.     The SEC issued a legal bulletin in October 2009 declaring that, "one of the board's key functions is to provide for succession planning so that the company is not adversely affected due to a vacancy in leadership."

43.     The Board caused the Company to issue a Proxy Statement on or about February 1, 2011 (the "2011 Proxy Statement"), which contains a description of the Board's purported criteria for assessing the qualification of potential CEO successors including "strategic vision and leadership, operational excellence, financial management, executive officer leadership development, ability to motivate employees, and an ability to develop an effective working relationship with the Board."

44.     Notwithstanding what is stated in the 2011 Proxy Statement, upon information and belief, the HP Board had no succession plan in place, nor any serious process to evaluate potential candidates consistent with the foregoing criteria.  Indeed, neither Defendants Apotheker and Whitman would have been hired had the Board set criteria consistent with HP's culture and needs.

45.     As explained in the article entitled, "*Corporate Boards and the CEO Selection Process*," by John M. Holcomb, a University of Denver Professor,

> Due to a company and governance system in need of repair, HP has been on the search for an outside savior since the selection of Carly Fiorina as CEO.  Studies attest to the wisdom of cultivating inside candidates instead, and HP has paid a dear price for continually turning to outsiders.

46.      Even before the Company's most recent debacle became public on November 20, 2012, Mark Chandler, General Counsel for Cisco Systems, Inc., in an article published by *The Wall Street Journal* on November 28, 2011, described HP as a "company beset by the chaos of executive turnover."

47.     The revolving door of CEOs has led to many tens of millions of dollars in wasteful severance payouts and has resulted in HP being relegated to "poster boy" status and a "laughingstock in Silicon Valley" for failure of corporate governance and breach of fiduciary duty by members of the Board.

48.     According to *The New York Times* of September 21, 2011:

> "The answer, say many involved in the process, lies squarely with the troubled Hewlett-Packard board. **'It has got to be the worst board in the history of business,'** Tom Perkins, a former H.P. director and a Silicon Valley legend, told me." **(emphasis added)**

49.     Former General Electric CEO, Jack Welch, sharply criticized the Board:

> "The Hewlett–Packard board has committed sins over the last 10 years." "They end up blowing up the CEOs and don't have anyone else in mind to come in.  Where the hell was the leadership development?"

**B.**     **The Firing of Mark Hurd**

50.     On a date prior to August 6, 2010, HP's Board asked for and received the resignation of it's the CEO, Mark Hurd, in connection with his highly publicized relationship with Jodie Fisher involving claims of sexual harassment, inappropriate sexual advances and, admittedly, an inappropriate relationship between the participants, including Mr. Hurd's submission of unjustified expense reports related to such relationship and otherwise, and the Company's compensation of Ms. Fisher, as approved by Mr. Hurd, for services and expenses of questionable or no value.

51.     Despite Mr. Hurd's enormous personal compensation, according to HP's now-terminated General Counsel, Michael Holston, Mr. Hurd (a defendant in *Copeland I*) had a "systematic pattern" of padding his own expense accounts.  Such padding was carried out directly or through his assistant and HP Vice President, Caprice Fimbres McIlvaine, in material amounts which have not been disclosed publicly but which, upon information and belief, rendered the statements made in publicly-filed documents (including, *inter alia*, the Company's 2010 Proxy Statement) false and misleading.

52.     Although there was ample justification for dismissing Mr. Hurd "for cause," the HP Board did not do so.  Rather, the Board misappropriated the Company's funds to give a "going away" gift to Mr. Hurd in cash and HP stock, variously valued at $30 to 55 million (at the time of his termination), including the $12,224,693 "cash severance benefit" paid to him and the amounts paid to Ms. Fisher or other benefits she received at the expense of HP, all of which were for the ultimate personal benefit of Mr. Hurd.

53.     Such unjustified payments was the result of negligent drafting of Mr. Hurd's employment agreement by HP in-house or outside legal counsel, and the failure of Rajiv Gupta, John Hammergren, Joel Hyatt, Lucille Salhany, and Laurence Babbio, who were members of the

Board's "HR and Compensation Committee," in their oversight of the terms of Mr. Hurd's employment and reckless agreement to a "separation agreement" that failed to contain a "non-compete" provision.

54. As a result, Mr. Hurd immediately joined Oracle, a leading competitor of HP, as its new Co-President, as of September 6, 2010.

55. The HP Board then recklessly approved the filing of a belated lawsuit against Mr. Hurd, claiming the former CEO would take unfair competitive advantage of his intimate knowledge of HP's products, marketing, and service strategy.[5] Reflecting the Board's own frustration with the improvident negotiation of Mr. Hurd's original compensation package and the "separation agreement," such lawsuit, was vindictive and threatened any future cooperation between HP and Oracle.

56. As reported by *The New York Times* on September 10, 2010:

> "**The Hewlett-Packard board is back to doing what it does best: shooting itself in the foot.** By filing an embarrassing lawsuit against the company's former chief executive Mark V. Hurd, this week – a suit that unwittingly highlights the mistakes it made in the way it let Mr. Hurd go – **the H.P. board can now lay claim, officially, to the title of the Most Inept Board in America.**" **(emphasis added)**

**C.** **The Reckless Hiring and Firing of Defendant Apotheker**

57. Mr. Hurd had told the Board that no internal candidates, including Todd Bradley, Ann Livermore, Tom Hogan, or David Donatelli, were ready to be CEO. After Mr. Hurd's departure from HP, the Board heeded his evaluations, and ruled out the internal candidates, resorting to an interim CEO, CFO Catherine A. Lesjak, for two months.

58. The Board appointed Messrs. Babbio, Hammergren, Andreesen and Hyatt to look for a new CEO. They narrowed the choices down to three candidates, but then rushed recklessly

---

[5] Separate and apart from the "separation agreement," Mr. Hurd had and retains fiduciary duties to HP and its shareholders not to, *inter alia,* misuse the Company's proprietary information, trade secrets or otherwise cause it harm. Upon information and belief, Mr. Hurd was and may still be breaching such duties in his role as Co-President of Oracle.

into hiring Defendant Apotheker, 55 days after Mr. Hurd's dismissal.

59.     *The New York Times* of September 21, 2011 described the circumstances under which the Board hired Defendant Apotheker:

> "When the search committee of four directors [Babbio, Hammergrent, Andreesen, and Hyatt] narrowed the candidates to three finalists, no one else on the board was willing to interview them. And when the committee finally chose Mr. Apotheker and again suggested that other directors meet him, no one did. Remarkably, when the 12-member board voted to name Mr. Apotheker as the successor to the recently ousted chief executive, Mark Hurd, most board members had never met Mr. Apotheker.
>
> 'I admit it was highly unusual,' one board member who hadn't met Mr. Apotheker told me. 'But we were just too exhausted from all the infighting.'

60.     Defendant Apotheker's hiring was a hasty, ill-conceived choice carried out without an interview by the full HP Board or any serious Board consideration of his background, including his lack of experience in hardware, the business that drives HP's revenue, his leadership problems at SAP, his most recent employer, and his role in SAP's intellectual property theft of Oracle.

61.     Eric Jackson, managing member of Ironfire Capital, stated "Apotheker is the worst CEO hire in the last decade."

62.     After Defendant's Apotheker's hiring, an "ad hoc committee" was formed consisting of Defendant Apotheker, Lane, Babbio (who also served on the Nominating and Governance Committee) and Hammergren.   Such committee chose five director nominees including Defendant Apotheker, Senequier, who sat on the board of Schneider Electric with Apotheker, Russo, Reiner, and Whitman, all three of whom had previous business connections to Apotheker.   The Nominating Committee consisting of Babbio, Baldauf and Thompson chose two director nominees, namely Banerji and Livermore.

63.     Institutional Shareholder Services ("ISS"), a corporate governance research firm, criticized Babbio, Baldauf and Thompson for allowing Defendant Apotheker to have a direct role in choosing five new board members, claiming such action violated HP's internal governance rules and raised "red flags."  As the ISS report stated, "Given the problematic board issues that have arisen at the company in the past (including the forced resignation of a former independent chair in 2006), shareholders would have expected the company to adhere to the highest standards of board governance."  The ISS recommended that shareholders vote against the re-election of Babbio, Baldauf and Thompson.

64.     Defendant Apotheker's strategy for fixing the deteriorating HP was to spin off its PC division and buy a large data analytics company.  The announcement of his plan on August 18, 2011 alone caused HP shares to plunge 20% in one day.

65.     On Defendant Apotheker's watch, HP stock fell 47%, or a loss of over $40 billion in the Company's market value.

66.     On September 22, 2011, Defendant Apotheker was fired by the same Board that had been so reckless in hiring him ten months earlier.  Members of the HP Board leaked the news of the firing to media outlets before the official announcement was made by the Company.  As Jackson stated, "These guys are a bunch of clowns surpassed in incompetence only by Yahoo's board."   Corporate governance specialist, Richard Davis, a partner at RHR International, a leadership consultancy firm, noted, "Just look at what's been going on the past several years at HP – clearly, something is going on with this board."

67.     Defendant Apotheker's incompetence and short, tumultuous tenure was generously rewarded by the Board with a severance payout of over $13.2 million, including a fiscal 2011 bonus of $2.4 million for his disastrous 10 months in office.

68.    Julianne Pepitone exclaimed in *CNN MoneyTech* on September 22, 2011, Defendant Apotheker's "messy firing is a mirror of his messy hiring."

69.    *The New York Times* stated on October 1, 2011, "Apotheker's short, turbulent reign as the chief executive of Hewlett-Packard was by nearly all accounts a disaster.  The board demanded his resignation, and if there ever was a case for firing someone for cause, this would seem to be it."

**D.    The Reckless Hiring of Defendant Whitman**

70.    Immediately after Apotheker departed, the Board abruptly hired another outsider, Defendant Whitman, as President and CEO, without having conducted any search.

71.    Although Whitman lacks the experience necessary to run a large, complex computer hardware, software and technological services company such as HP, having worked in consumer companies, and although she was principally responsible for the recklessly made Skype acquisition at eBay, handing shareholders a $2.75 billion loss, Mr. Lane presented his close personal friend as "uniquely qualified."

72.    Defendant Whitman's rushed selection by the Board has been widely ridiculed in the business media.

73.    Ms. Whitman accepted the position on condition that Mr. Lane serve as Board chair.  Had the Board been more unified and reliable, Ms. Whitman would not have been able to exert such undue influence.

74.    Barely a month into Whitman's tenure as CEO, HP announced on October 27, 2011 that it would retain the Company's personal computer business, thereby closing off the strategic path offered by her predecessor, Apotheker. Nevertheless, Apotheker already had irreversibly damaged HP's PC business, since its revenue continued to decline, as noted by the 10% drop for the third quarter of 2012, and market share fall, while Lenovo is set to overtake HP

as the largest PC vendor in what is still a huge market.

75.     Under Defendant Whitman's leadership, HP's financial outlook continues to deteriorate and its stock has traded near a 10-year low, as noted in a critical article which appeared in *The Wall Street Journal* of October 30, 2012.  Such article reported that Defendant Whitman "has repeatedly blamed her predecessors [Defendants Hurd and Apotheker] for not investing in research and development as a reason for why H-P is now struggling." She is also directly quoted as admitting that: "We haven't had a new product lineup in seven years…It was very obvious that we had a product gap here."

76.     At the time, Ms. Whitman concealed from the public the scandal well-known by the Board from at least May 2012 pertaining to the acquisition of Autonomy.

77.     The Autonomy deal has led to a possible return to Defendant Apotheker's failed strategy to dispose of certain underperforming businesses.   Despite Defendant Whitman's announcement in October 2011 that HP would not dispose of its PC business, according to HP's December 27, 2012 Form 10-K filing with the SEC, HP may be considering this option seriously.   HP wrote: "We also continue to evaluate the potential disposition of assets and businesses that may no longer help us meet our objectives."  This back-and-forth in the decision to spin-off or sell the PC business only further exacerbates the already precipitous decline in the Company's value.

**E.    Failed Acquisitions**

78.     HP's primary business, computer and related hardware manufacturing, has become stagnant.  The Board's purported strategy for transforming the flailing company into a leader in the technology industry through mergers and acquisitions has resulted in a decade-long history of recklessly-pursued acquisitions.

79.     As Dane Anderson, IT outsourcing analyst with the Garner research firm, has explained, "HP has had a ready, fire, aim approach to acquisitions…They seem to say: this looks good, let's buy it because we can buy it and we'll figure out what to do with it later."

80.     The members of the Board's Finance and Investment Committee have repeatedly failed to uphold their fiduciary duties and abide by the Committee's Charter, which requires them to "evaluate the execution, financial results and integration of HP's completed investment, acquisition, enterprise services, joint venture and divestiture transactions."

81.     Beginning in 1999, HP spun off its measurement device unit, which included technologies that were the genesis of HP and the core to its success, to Agilent Technologies. HP's Board tried to remake the Company with the controversial $25 billion acquisition of Compaq in 2001, increasing HP's presence in the PC business at a time when the industry was becoming low growth and low margin.  Ten years later, in August 2012, HP was forced to write down an additional $1.2 billion in its value, having already absorbed substantial write downs since the Compaq acquisition.

82.     When Mr. Hurd became CEO of the Company, he continued down the path of ill-fated acquisitions.  The 2008 acquisition of EDS ended up with a write down in the third quarter of 2012 of approximately $8 billion due to a goodwill impairment of the $13.9 billion it paid for EDS.  The reckless all-cash acquisition of Palm, Inc. for $1.2 billion in 2010 before Mr. Hurd resigned also proved unsuccessful.  Just one year later, in November 2011, HP took a $1.67 billion write down for Palm.

83.     Immediately following Mr. Hurd's departure, while the Company was without a CEO, on September 27, 2010, HP completed its acquisition of 3Par for $2.3 billion, of which $1.6 billion was subsequently recorded as intangible "goodwill" and $569 million as other intangible assets.  HP's offer, which was the culmination of a reckless bidding frenzy in which

the Company's outside legal counsel was a principal advisor to the Board, was about ten times 3Par's total revenue over the previous four quarters and was the highest premium offered in a competitive bidding situation of American deals of at least $50 million tracked by Bloomberg since 2001.

84.     During the period when HP was considering the acquisition of 3Par, HP's legal counsel, Wilson, Sonsini, Rosati & Goodrich, P.C.   ("Wilson, Sonsini") was simultaneously representing 3Par and working closely with it to fuel the bidding frenzy that was underway.   At all relevant times, Wilson, Sonsini was intimately aware of confidential and proprietary information it had obtained as counsel to HP including, *inter alia*, its need to make a significant acquisition in the wake of the Hurd-Fisher scandal that was constantly in the news media, HP's resources and needs and its negotiating/bidding strategies.   Upon information and belief, Wilson, Sonsini used such intimate, confidential and proprietary knowledge in advising 3Par and its investment bankers how to maximize the amount that would be paid for 3Par, all to HP's detriment.

85.     *Bloomberg* reporter Katie Hoffmann quotes analyst Aaron Rakers, who had pointed out the Board's desire "to show [HP] can clinch the deal after the departure of its chief executive officer."   Wilson, Sonsini was well-aware of the Board's desire and used such information in advising 3Par in its negotiating strategy.

86.     In the wake of the public eruption of the Hurd-Fisher scandal on August 6, 2010, as Wilson, Sonsini was well-aware, HP's Board was particularly mindful of the need to generate publicity for the Company by an event that would generate positive "buzz," hardly a justifiable reason to make an acquisition for $2.3 billion.

87.     Although HP has not yet written down large portions of the purchase price paid for 3Par, as it already has for EDS, Palm, and Autonomy, 3Par has been buried in HP's

Enterprise, Servers, Storage & Networking ("ESSN") business unit, which has continuously experienced a decline in revenues.  Defendant Whitman has admitted that turning around ESSN is not something that can be done quickly.  It is anticipated that a write down of most of 3Par's $2.3 billion acquisition cost may be forthcoming.

F.       **The Autonomy Debacle**

88.       In March 2011, Defendant Apotheker launched his strategy, devised jointly with Defendant Lane, to "transform"  HP by spinning off or selling its PC division and buying a large date analytics company.

89.       A five-member committee, including Babbio, Russo, and Lane, studied the options for the PC division, but did not do enough due diligence to evaluate the impact of Defendant Apotheker's plan.  They met just twice and did not even consult Todd Bradley, the head of that division.

90.       According to a November 30, 2012 *Reuters* report, "Apotheker went on the acquisition trail almost immediately, even though previous HP takeovers like Compaq and Palm had not worked out well."

91.       In April 2011, Frank Quattrone, who had a substantial degree of influence over HP's Board, set up a meeting among Defendants Lynch, Apotheker and Lane.  In May 2011, the HP Board hired Barclays Bank PLC and Perella Weinberg partners to evaluate the possibility of acquiring Autonomy.  In July 2011, Defendant Apotheker made a presentation to the Board on the merits of such acquisition.  At such meeting, because Apotheker wanted HP to make a "transformative" acquisition, he concealed from his fellow directors material facts regarding Autonomy including, *inter alia,* the extent of its highly questionable revenue accounting and other practices.  After the meeting, CFO Lesjak announced her disapproval, stating that the proposed transaction was "too expensive." Upon information and belief, she had serious doubts

regarding Autonomy's revenue recognition practices but did not publicly express them at that time.  Despite Lesjak's objections, on July 28, 2011, Defendants Lynch and Apotheker agreed to a deal in principle.

92.     The HP Board approved a limited three week due diligence period for the potential offer, which occurred between July 28 and August 18, 2011.   HP hired KPMG LLC in a limited engagement solely to review the audits performed by a severely conflicted Deloitte.  Defendant Lynch provided HP with publicly-reported financial statements and 25 sales contracts, but refused to provide requested financial materials underlying Autonomy's audits.

93.     With respect to Autonomy, HP failed to follow its normal due diligence procedures.  The due diligence team reported to Sean Robison, instead of to CFO Lesjak, whom Defendants Apotheker and Lane knew was opposed to the transaction.  Additionally, according to a January 21, 2013 *Wall Street Journal* article entitled "Inside HP's Missed Chance to Avoid a Disastrous Deal," "H-P's normal procedures require the board's finance committee to review and approve deal proposals before they reach the full board.  That didn't happen with the proposal to acquire Autonomy, said people familiar with how the board proceeded."   In fact, Defendant Apotheker pressured his subordinates to move quickly on "due diligence" and "short circuit" such "normal procedures."

94.     HP's August 18, 2011 news release unveiled the details of the plan launched by Defendant Apotheker in March as a show of his own "arrival" on the scene as a "player."  Apotheker announced an offer by HP to buy Autonomy in order to accelerate the Company's ability to offer "cloud-based" solutions and to boost his own purported competence following his failure at SAP.

95.     On August 19, 2011, HP's stock price fell 20%.   In the face of a negative response by shareholders, Defendant Lane, who had actively pushed the Autonomy deal, sought

to blame Defendant Apotheker for the failed new direction.

96.     Defendant Apotheker, for his part, tried to ease the minds of HP's shareholders in a September 13, 2011 investor conference call hosted by HP, where he stated, falsely:

> "We have a pretty rigorous process inside HP that we follow for all of our acquisitions, which is a DCF-based model, and we try to take a very conservative view at this.   Just to make sure everybody understands, Autonomy will be, on day one, accretive to HP."

97.     He continued, "We did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy.  And it will give a great return to our shareholders." He failed to disclose either to the public or even to his fellow Board members that he had put form over substance in such "due diligence" analysis, which was woefully inadequate, especially given the facts which Defendant Apotheker knew or should have known regarding the legitimacy of Autonomy's reported revenues and earnings, all of which were materially exaggerated, particularly those at a subsidiary, Autonomy Systems, Ltd.

98.     Defendant Apotheker's comments were intentionally deceptive since he knew that, prior to its consummation, the HP Board was intent on closing the Autonomy deal without conducting the level of due diligence necessary for a potential acquisition of such magnitude, particularly after issues had been raised as to the legitimacy of Autonomy's accounting.  Upon information and belief, Apotheker's deception extended to those in HP's management, who were charged with evaluating the Autonomy acquisition, as well as his colleagues on the Board, who had to approve closing on the transaction.

99.     As John Schulz, HP General Counsel, later admitted, Autonomy did not have well-maintained financial records, and additionally, the Autonomy deal was widely regarded by securities analysts and the business news media as greatly overpriced.

100.     Larry Ellison, CEO of Oracle, made public statements in August and September 2011 that Oracle had "taken a pass" on acquiring Autonomy as he believed it was over-valued at

$6 billion.  The Oracle website posted the power point slides given to Oracle by Mike Lynch, Autonomy's then CEO, which showed Autonomy's revenue and enterprise value, as of January 24, 2011, to be about $5.7 billion, at best.

101.    The HP Board was well aware that there were serious accounting irregularities at Autonomy, specifically questionable revenue recognition practices.  Its members also knew or recklessly ignored the fact that the 40-45% operating margins touted by Autonomy did not seem likely given its customer base, and that Autonomy, most likely, operated at 28-30% margins, severely diminishing the value of it, rendering HP's purchase decision a waste of corporate assets.

102.    The HP Board was also aware that Autonomy's identifiable assets were worth far less than HP's purchase price since HP was required to record $6.6 billion of goodwill and $4.6 billion of amortizable intangible assets, as part of the acquisition.  A similar situation had already occurred with the purchases of Palm and 3Par.  Given the substantial overpayments in the acquisitions of Palm and 3Par, both clients of Frank Quattrone, an investment banker in the technology industry well known to and with a curious ability to "smooth-talk" the HP Board, but Quattrone had a well-known checkered past, and the fact that Autonomy was Mr. Quattrone's client should have made the HP Board highly skeptical of the deal.  However, both Defendants Whitman and Andreesen, in particular, were improperly influenced by their close personal relationships with Quattrone, and ignored their fiduciary obligations to HP.

103.    A week before the Autonomy deal closed, and after Defendant Apotheker was fired, Defendant Whitman assured investors that "the Autonomy acquisition, which I'm excited about, is proceeding as planned."  Behind the scenes, Defendants Whitman and Lane actively sought to rescind HP's offer to acquire Autonomy due to the negative market response, and Whitman's learning that Autonomy had been engaging in questionable accounting practices.

HP's financial advisers, Barclays and Perella, which had been paid $30 million for their purportedly objective and independent advice, informed Defendant Lane that HP could not back out of the deal due to British law (not coincidentally, had the transaction not closed, Barclays and Perella would have received nominal compensation for their services).

104.    On October 3, 2011, HP completed its purchase of Autonomy for more than $11.7 billion, notwithstanding (i) the departure of Defendant Apotheker, who initiated the deal; (ii) the Company's abandonment of his strategy; (iii) the well-known issues regarding Autonomy's questionable revenue recognition and related accounting practices, of which HP General Counsel, John Schultz has admitted that he was aware; (iv) the over-valuation of Autonomy as compared to similarly-sized companies in the same industry and given that it only reported approximately $250 million in profit annually; and (v) the implacable opposition of Catherine Lesjak, the Company's CFO.  According to an account in *Fortune* magazine in May 2012, Ms. Lesjak made an impassioned presentation to the Board and argued that the deal was not in the best interests of shareholders.  One person who spoke to her the day the deal was announced reported that she was afraid she would be fired for being so outspoken.

105.    Once the Autonomy acquisition was completed, in accordance with Defendant Whitman's directive, representatives of HP, including Ms. Lesjak, Nicole Eagen, and Ms. Whitman, repeatedly praised the deal to the public notwithstanding their serious personal reservations.  In particular, they made numerous statements purporting to justify the astronomical price paid for Autonomy by touting the existence of a supposed groundbreaking product, Next Generation Information Platform IDOL 10, which was claimed to combine the technologies of Autonomy and Vertica, another HP acquisition, and had been available for sale since December 1, 2011.  However, to date, no such product or symbiosis exists.  Defendant Whitman and the HP Board purposely misled the public despite knowing from the start that HP grossly overpaid for

Autonomy's outdated technology.

106.   In April 2012, Whitman terminated Defendant Lynch's employment.   The HP Board aggressively conducted internal efforts to clean up Autonomy's improper accounting quietly without alerting investors.   Indeed, the Board and senior management conspired to keep from the investing public what they already knew of the Autonomy debacle, even though they did not know its ultimate cost to the Company.   In so doing, they caused the Company to violate federal disclosure laws and breached their duty of candor, all of which operated as a fraud on investors.   While the Board was aware of the revenue recognition irregularities before and at the time of the consummation of the acquisition of Autonomy, it had no knowledge until approximately March or April 2012 of the magnitude and full nature of the respective deceptions perpetrated by Defendants Apotheker and Lynch.

107.   In May 2012, the HP Board received direct notice from a whistleblower that Autonomy was plagued by accounting improprieties, a fact that the HP Board members were already generally aware.   The Board continued to conceal the existence of the magnitude and scope of the Autonomy debacle which, by March or early April 2012, had become known to each of its members.

108.   On May 23, 2012, Defendant Whitman, although she acknowledged in HP's second quarter 2012 earnings conference call that Autonomy had a disappointing quarter, she continued to conceal the most material of facts; namely, that the Autonomy acquisition had been an unmitigated disaster which would result in the write-off of the bulk of the purchase price. She stated cryptically and deceptively that HP:

> actually did a fairly deep dive to understand what had happened here.  And in my view, this is not the product.  Autonomy is a terrific product.  It's not the market.  There is an enormous demand for Autonomy.  It's not the competition.  I was wondering, is there a competitor that we didn't see, and the answer to that is no.  This is classic entrepreneurial company scaling challenges.

109.   On May 29, 2012, *CRN* reported that "roughly 250 Autonomy employees quit" since the acquisition closed including Autonomy's President, COO, Chief Marketing Officer and Chief Technology Officer.

110.   On June 8, 2012, HP filed its second quarter 2012 Form 10-Q with the SEC, signed by Defendant Whitman and CFO Lesjak.  Such Form 10-Q did not mention HP's  internal investigation into Autonomy's financial statement, which was already well underway since approximately May 2012.  During a press interview on June 5, 2012, Whitman stated deceptively and misleadingly once again stated:

> In my view, this is the classic case of scaling a business from startup to grownup.  Going through that barrier of a billion dollars in sales is not easy because you can't run the organization at $1.5 billion the same way you did at $500 million.  You just can't.  And for many entrepreneurs, processes and discipline are dirty words, and you have to have those things, especially within the context of HP.  I know exactly how this world [works].  My view was that we needed to make a change to someone who can take Autonomy to the next level.  I have every confidence that Autonomy will be a very big and very profitable business.

111.   HP's third quarter 2012 SEC Form 10-Q, released on September 10, 2012 reported merely a hint at what the Board and senior management knew was coming and stated deceptively:

> The Software segment includes $14.6 billion of goodwill, of which $7.7 billion relates to the legacy HP software business and $6.9 billion relates to the Autonomy acquisition.  Based on HP's last annual goodwill impairment review completed as of August 1, 2011, the excess of fair value over carrying value of the legacy HP software business was 38% of the carrying value, which is lower than that of HP's other reporting units.  At the time of the Autonomy acquisition in October 2011, the fair value of Autonomy approximated the carrying value.

112.   A 6-month internal investigation by PricewaterhouseCoopers LLP was launched in May 2012, culminating in the November 20, 2012 announcement that HP was forced to write-down most of its investment in Autonomy, and take an $8.8 billion charge, approximately 80% of the purchase price paid for Autonomy just one year earlier.

113.    While the November 2012 announcement admitted that "Autonomy was substantially overvalued at the time of its acquisition," Whitman tried to absolve herself and the HP Board of responsibility for the debacle and shift the blame to her predecessor Apotheker and former Chief Technology Officer, Shane Robison, who received over $9 million in compensation in 2011, as well as to Autonomy's former CEO, Defendant Lynch, Deloitte LLP, which served as Autonomy's independent auditor prior to and during the acquisition, KPMG International, which HP now claims, but KPMG denies, was engaged to audit Deloitte's work on Autonomy, and Barclay's Capital, which served as the badly-conflicted joint financial advisor and corporate broker to HP during the acquisition.

114.    Defendant Whitman accused Defendant Lynch of engaging in improper accounting practices, stating that more than $5 billion of the impairment charge "is linked to serious accounting improprieties, misrepresentation and disclosure failures" committed by "former members of Autonomy's management team."  As a result, HP had made material overstatements to its goodwill reported in its Form 10-K filed with the SEC on December 14, 2011, and three Form 10-Qs filed in 2012.

115.    In U.K. regulatory filings made on January 31, 2014, HP revised the 2010 financial reports for Autonomy.  Michael Thacker said, "These restatements, and the reasons for them, are consistent with HP's previous disclosures regarding accounting improprieties in Autonomy's pre-acquisition financials."  Mr. Thacker continued in an email, "The substantial work necessary to prepare these accounts has revealed extensive accounting errors and misrepresentations in the previous issued 2010 audited financial statements, including the problems previously identified by HP."

116.    In response to the November 20, 2012 announcement, the price of HP's common stock fell nearly 12%, eliminating more than $3.1 billion from the market capitalization in a

single day and leading to a class action and other claims by defrauded investors, for which HP will be ultimately held accountable at substantial additional cost.

117.    The deception carried out by Defendant Whitman and the Board violated, *inter alia*, the Board's disclosure obligations under and pursuant to the Exchange Act and its members' duties of candor owed to HP and its shareholders.

118.    During the same time period, in order to support HP's share prices, the Company, under the direction of the Board and Defendant Lane, recklessly approved the repurchasing of 24,053,000 shares of its common stock at an aggregate cost of approximately $489,221,520. After the news broke about Autonomy's true value and its disastrous impact upon the Company, HP's stock plummeted to $12 per share.

119.    To make matters worse, HP is funding its reckless acquisitions through a questionable tax evasion scheme.  On January 2, 2008, HP devised a "staggered" foreign loan program specifically designed to provide a continuous flow of billions of dollars of offshore profits to the US without paying US taxes.  The funding for these loans comes mainly from two sources, the Belgian Coordination Center and the Compaq Cayman Holding Corp.  These offshore subsidiaries alternately loan funds to HP in back-to-back-to-back-to-back 45-day loans. Since the inception of this program, there is never a day that HP does not have an outstanding loan of billions of dollars from one of these foreign subsidiaries.

120.    The lending from these two offshore entities is an essential component in the funding of HP's US operations, including payroll expenses, stock repurchases, and acquisitions. Indeed, an HP power point provided to the United States Senate Permanent Subcommittee on Investigations in September 2012 characterized the loan program as "the most important source of liquidity for repurchases and acquisitions."  As attention is drawn to these practices, HP is likely to be assessed substantial taxes, interest, and penalties since its senior management and

Board, as well as HP's auditor, Ernst & Young, LLP ("E&Y") have long known or should have known that the repatriated funds are subject to at least federal taxation because they do not meet the timing restrictions and lending entities independence requirements of Section 956 of the Internal Revenue Code.

### G.        Bribery, Kickbacks and Illegal Rebates

121.    Current and former HP officers and other executives in HP's German and Russian offices paid more than $10 million in bribes, in violation of the FCPA, in an attempt to obtain a $47.3 million contract to supply computer equipment and related software to the Russian Prosecutor General's office.  Under the supervision of Mr. Hurd and certain of HP's lawyers, the Company initially "stonewalled" the SEC, the DOJ and other investigative bodies.  Moreover, they advised HP not to voluntarily and timely disclose its FCPA violations.  As a result, the penalties and fines flowing from such violation are likely to be much more severe than if HP's management and legal counsel had cooperated with the investigations from the outset and disclosed these violations of the FCPA and others which may yet be publicly unknown.  Such wrongdoing subsequent to the original violations of law have continued to the present, all of which has been acquiesced in and concealed by each of the presently sitting members of the Board as well as their predecessors.

122.    On August 30, 2012, three HP executives were criminally indicted in Germany.  As disclosed in HP's first quarterly report in 2013, the German government asked that the Company be named as a defendant in the bribery case, exposing it to potential disgorgement of profits and other penalties.

123.    In light of the foregoing conduct by the culpable executives subordinate to former CEO Hurd, and the passivity of the Audit Committee of HP's Board, including Baldauf, Joyce, Salhany, Thompson, and Ryan, the Company has been required to pay and will continue to pay

substantial legal and other expenses. The Company has yet to disclose whether and/or the extent to which its legal counsel are participating in negotiations with the SEC, the DOJ, and other investigative bodies. Further, as a result of these violations of the FCPA and other laws, the Company is likely to be penalized substantially by the SEC, the DOJ, and other governmental agencies in amounts which cannot presently be estimated but which are likely to be substantial. In particular, the Company is likely to be penalized for its lack of cooperation in the investigations and failure to make timely disclosure of them.

124. By way of intentional avoidance of the full and fair disclosure of all material facts as required by the Exchange Act and the Board's duty of candor, the Company's Form 10-Q Report of June 6, 2013 merely states in the most general and obfuscatory language:

> Under the FCPA, a person or an entity could be subject to fines, civil penalties of up to $500,000 per violation and equitable remedies, including disgorgement and other injunctive relief. In addition, criminal penalties could range from the greater of $2 million per violation or twice the gross pecuniary gain or loss from the violation.

125. Although the HP Board has long known of such widespread violations of the FCPA and the magnitude of the Company's financial exposure have been long known by HP's Board, as well as the wrongful failure to acknowledge these violations of law in order to mitigate the Company's exposure, the Board and senior management continue to remain silent. The culpable executives and the responsible members of HP's Board including Hurd, Baldauf, Joyce, Salhany, Thompson, and Ryan should be required to pay personally any fines or penalties that are sought against HP as a result of their illegal conduct and its concealment. To the extent any statutes of limitations applicable to the Company's FCPA violations and/or the cover-up and stonewalling that took place in connection therewith, were allowed to run, precluding the Company from pursuing legal claims against culpable officers and directors, such inaction was the result of the failure of the Board to even consider such claims, and each of them in office has

wasted HP's assets and breached his or her fiduciary duties to the Company.  Similarly, to the extent that the Board gave no consideration to obtaining tolling agreements from the culpable executives or directors, its members have similarly wasted HP's assets and breached their fiduciary duties, especially since the Company received no benefit whatsoever by its failure to do so.

### H.    False and Misleading Proxy Statements

126.    Every year in March, the Company holds an annual meeting of shareholders. Prior to these annual meetings, the Board causes the Company to issue and disseminate a Notice of Annual Meeting and Proxy Statement.  Most recently, the Board caused to be issued HP's 2014 Proxy Statement on February 3, 2014, which was not materially different from previous proxy statements.

127.    Since 2010, HP directors serving at the relevant times, recommended that shareholders vote for each of the Board's nominees for election to the Board and for the ratification of the appointment of HP's independent registered public accounting firm, E&Y, all the while omitting material facts bearing upon these issues, and impacting materially as to how the shareholders of the Company would vote thereupon.

128.    Every HP proxy statement since 2010 contains essentially the same false recitations describing the supposed process by which director nominees were considered and evaluated, as well as short recitations of the jobs and directorships held by nominees, and membership listings of each of the committees of the Board in the prior year.

129.    The HP Board was well aware of the information required to be disclosed in the 2013 and 2014 Proxy Statements since E&Y, the Company's purportedly independent accountant and auditor, prepared a detailed report for the Board in November 2011 describing these requirements.

130.   The report specifically states that proxy statements such as those of HP must provide information about the nominees "intended to allow shareholders to judge the professional competence, accountability and effectiveness of directors and officers and the qualifications of nominees."   According to E&Y, such disclosure should cover the "process for identifying and evaluating potential nominees for director", the source of the nominee's recommendation, "the specific experience, qualifications, attributes or skills that led to the conclusion that the individual should serve as a director" and "[a]ny involvement during the past 10 years in certain types of judicial and administrative proceedings, to the extent material to an evaluation of the ability or integrity of the executive officer, director or nominee (including bankruptcy, criminal, injunctive and securities-related proceedings)."

131.   E&Y explained to the Board that "the SEC's final rule, Proxy Disclosure Enhancements, expanded the list of legal proceedings under item 401(f) to include: (1) any judicial or administrative proceedings resulting from involvement in mail or wire fraud or fraud in connection with any business entity, (2) any violations of federal or state securities, commodities, banking or insurance laws and regulations, or any settlement of those (or related) actions" including, *inter alia*, disclosing pending and previous shareholder litigation, accusing them of violating their disclosure obligations under the federal securities laws, breaching their fiduciary duties, including the duty of loyalty, and wasting corporate assets.

132.   In all of the Company's proxy statements since 2010, there is no description ofcrucial actions and/or material inactivity taken by the committees of the Board, the manner of selection of nominees, or other vital information regarding the professional competence, accountability and effectiveness of each of HP's directors, all of which could have been done in factual, non-pejorative language.

133.   For example, there is no disclosure of the fact that HP Board's Finance Committee, chaired by Director Hammergren, and consisting of Directors Hyatt, Babbio, and Thompson, authorized HP's interim management to engage in a "bidding frenzy" in its acquisition of 3Par.  Nor was it ever disclosed that the HP Board's Technology Committee ignored the fact that Palm's mobile device product, at the time of the Palm acquisition, was failing since it could not compete with devices being produced by Apple and Google.

134.   Other than tracking each director's purchases and sales of HP stock, the Board made no serious evaluation of director nominees or sitting directors, particularly in terms of their performance and effectiveness, and, in particular, whether they could devote the amount of "quality" time fulfilling their fiduciary responsibilities as directors of the Company.

135.   The fact that HP's 2013 and 2014 Proxy Statements read like every previous proxy statement is the most glaring example of the foregoing and other material omissions.

136.   As is disclosed in the 2013 and 2014 Proxy Statements, the HP Board members receive lucrative compensation for serving as directors, as well as fees for their committee assignments, and attendance at meetings, which, in the aggregate, amount to millions of dollars per year.  Given the scope of the debacles the Company encountered in 2011 and 2012, rather than conceal relevant information, the 2013 and 2014 Proxy Statements could and should have disclosed specific material facts relating to each nominee's performance and specific activities. In this way, HP's shareholders could make their own informed decisions, in the context of what the Board did disclose regarding its members, as to whether or not they warranted re-election to the Board.  Moreover, for about three weeks prior to the Board's dissaemination of HP's 2014 Proxy Statement, the Board had possession of the "findings and recommendations" of the latest iteration of one of its standing committees, the "Independent Committee."  Such facts, among others, were material to the issues put before HP's shareholders for votes at the Company's 2013

and 2014 annual meeting including, in particular, the nominees for re-election to the Board. All of such material facts could have been disclosed by the Board to HP shareholders in non-pejorative and neutral language (such as they are set forth in the "Independent Committee's" "findings and recommendations" arising from Mr. Ferrara's investigation of the Autonomy acquisition and otherwise) and were not, despite their importance and relevance to the suffrage process.[6] In the context of what was disclosed by the Board in HP's 2013 and 2014 Proxy Statements, such omissions of material fact were relevant and, indeed, critical to HP shareholders voting upon the Board's director re-election and the credibility to be afforded the Board's other recommendations.

137. Specifically, the 2013 and 2014 Proxy Statements failed to disclose the existence of and circumstances relating to HP's $18 billion in acquisition writedowns/writeoffs in fiscal 2012. Neither did the Board disclose the fact that these writedowns/writeoffs stem from the Board's own approval of the acquisitions and the circumstances thereof as described herein. The 2013 and 2014 Proxy Statements fail to disclose the role various directors played in the EDS debacle. There is no mention of the tens of thousands of job cuts and multiple changes in management of HP's services division since EDS was acquired. As Lawrence Latif explained in his article entitled, "HP's EDS write-off hides deeper problems," published in the *Inquirer* on August 23, 2012, "for an established business such as EDS to be overvalued by almost $10bn just four years after being acquired is **nothing short of gross incompetence** by HP in both the purchase and the subsequent handling of the firm once it became a part of HP." (Emphasis added).

---

[6] Such "findings and recommendations" were undoubtedly so material to any description of HP's governance that they should not only been disclosed in the 2014 Proxy Statement but in a Report on Form 8-K to the SEC on or about January 15, 2014. No such report was filed and the Board continued to keep HP shareholders and the investing public uninformed.

138.    The 2013 and 2014 Proxy Statements also fail to disclose the most material facts bearing upon the circumstances under which the HP Board approved the Autonomy acquisition as set forth above.   Had the HP Technology Committee (Defendants Whitman, Andreesen, Reiner, and Russo) met more than one time to discuss Autonomy, and reviewed a few industry reports, they would have discovered that Autonomy's Intelligent Date Operating Layer 7 database program was not user-friendly, had not been updated in five years, and was no longer competitive.

139.    Similarly, the "audit committee financial experts" (Defendant  Thompson, Mr. Babbio, Ms. Baldauf, and Defendant Banerji) just had to glance at Autonomy's publicly reported balance sheets, and they would have noticed that Autonomy's reported receivables of $330 million, as compared to reported total sales of $870 million, were not credible.

140.    These two committees' conscious disregard of "red flags" was an obfuscation of their fiduciary duties to HP and its shareholders and reflected the relatively modest amount of time devoted to HP's business, particularly by its non-management directors.   For example, former director Hammergren, CEO of McKesson Corp., who was compensated more than $355 million in the seven years ending March 2013, devoted himself well in excess of full-time to McKesson and relatively little time to HP.

141.    Had the Board disclosed to HP shareholders the foregoing material facts and others regarding the circumstances of the Autonomy and EDS acquisitions, as well as other serious misconduct bearing upon Board members' fitness to serve, the roles of certain Board members in those failed acquisitions, and the involvement of long-serving directors and/or those in leadership positions on the key committees in serious oversight failures, some or all of the nominees for directors may well not have been elected.   Moreover, had HP shareholders been provided all material facts regarding the Board's competence, they would have been better

positioned to evaluate the Board's recommendations presented to HP shareholders such as, *inter alia*, the retention of E&Y as the Company's purportedly independent accountant.

142.    Additionally, each of the Company's proxy statements purports to disclose the existence of all of the HP Board's "standing committees," the identities of their members, and their respective purposes.   The 2010 and 2011 Proxy Statements mentioned the following six standing committees: (1) Audit; (2) Finance and Investment; (3) HR and Compensation; (4) Nominating and Governance; (5) Public Policy; and (6) Technology.   The 2012 Proxy Statement states that the Public Policy Committee was dissolved on March 24, 2011, leaving the Board with five "standing committees."

143.    No HP proxy statement has referenced the "Special Litigation Committee", or the Ryan-Salhany "Special Committee" or the so-called "Independent Committee" purportedly formed to investigate certain shareholder demands upon the Board made as far back as 2010 or the most recent "Independent Committee" which hired Mr. Ferrara to conduct an investigation into the Autonomy debacle.   Each of these *de facto* "standing committees," however named from time-to-time, was charged by the full HP Board with addressing and/or investigating and/or appearing to investigate repeated acts of mismanagement and serious misconduct on the part of HP Board members and senior management.   The fact that the HP Board felt it necessary over a multi-year period to have in place "standing committees" of the HP Board to at least appear to address material wrongdoing by senior officers and the HP Board, was and is of the utmost materiality in HP shareholders' ability to understand the long-term failings of the HP Board, and, ultimately, how to vote upon the Board's voting recommendations in connection with the Company's annual meetings including, in particular, its nominees for re-election to the Board and the retention of E&Y as auditor.

144.    The HP Board repeatedly has opined that the Company's internal controls over financial reporting were adequate, as unjustly attested to annually by E&Y, despite the fact that the Company's internal controls were routinely circumvented in order to perpetuate the unlawful activities alleged herein in contravention of GAAP, and in violation of the FCPA and otherwise.

145.    Indeed, given the widespread and global bribery in which the Company's management was engaged but still not acknowledged by the Board, known to Mr. Hurd,  Ms. Lesjak, and in-house General Counsel Holston, among others, for many years, and the known pattern of false recording of business expenses by Mr. Hurd, it should have been obvious to E&Y and the Board's Audit Committee, which is required to "review the adequacy and effectiveness of HP's internal controls" and even HP's entire Board, that the Company's internal controls were materially deficient and displayed significant weaknesses.

146.    As a result of at least some of the Company's bribery activities which have come to public attention, HP was identified in a bribery indictment in Leipzig, Germany on August 30, 2012 and involuntarily revealed in the United States in *The Wall Street Journal* on September 20, 2012. The criminal charges were brought against three HP executives. The prosecutors, who have asked that HP be named as a defendant in the case, alleged that three HP Vice-Presidents approved creating a fund pursuant to which the Company paid about $10 million in bribes and used a German subsidiary and a network of shell companies' accounts the bribes paid in Russia. Although the Company now claims that it is cooperating in the investigations of it, including those underway by the DOJ and SEC, for years it "stonewalled" such investigations under the direct supervision of former CEO Hurd and former General Counsel  Michael Holston.[7]

---

[7] In addition to the bribes paid, the Company has been forced to retain numerous lawyers in the United States and abroad in connection with this and other bribery/FCPA investigations. The Company has been attempting to negotiate a deferred prosecution agreement with the DOJ and payment of a substantial fine with the SEC.

147.    Despite these material weaknesses in HP's internal controls, the Company's financial statements, appearing in its 2012 Annual Report, stated that its internal controls over financial reporting were effective.  Through its CEO and CFO, HP unjustifiably executed "clean certifications" pursuant to Sections 302 and 906 of Sarbanes-Oxley.  These certifications falsely and deceptively opined, *inter alia*, that the Company's CFO and CEO had disclosed all significant deficiencies and material weaknesses in the design for operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information.

148.    On or about May 23, 2013, the United States regulator of public accounting firms, the Public Company Accounting Oversight Board ("PCAOB") concluded in a damning report that E&Y has been fundamentally lax in its audits of public companies.  Even after having been warned repeatedly by the PCAOB, E&Y failed to "clean up its act" regarding the "sufficiency, rigor and efficacy" of the work done by its auditors, all of which resulted in the public release of the PCAOB's previously confidential criticism. Despite the PCAOB's preliminary warnings now finalized subsequent to the 2013 Proxy Statement) regarding E&Y's sloppy and unprofessional audit practices, none of which were disclosed by the Board in HP's 2013 Proxy Statement, the Audit Committee as well as the entire Board continued to recommend the retention of E&Y as HP's auditor. In the context of what was disclosed about E&Y in the 2013 Proxy Statement, HP shareholders should have been informed of these material, objectively-determined facts bearing on E&Y's fitness to be retained again as the Company's auditor. Similarly, the Board, in issuing the 2014 Proxy Statement, made absolutely no disclosure of the PCOAB's findings of facts absolutely material to E&Y's retention as HP's auditor, as recommended by the Board.

149.    As at least HP's Audit Committee, if not all Board members, knew, E&Y repeatedly breached its contractual and professional obligations to perform its audits of the

Company's financial statements in conformity with GAAS, which E&Y was obligated to do pursuant to the terms of its annual engagements by HP. Such breaches by E&Y were never disclosed in any of the Company's proxy statements even though the information would be highly significant to HP shareholders casting their votes as to the retention of E&Y as HP's auditor particularly in the context of the PCOAB's findings.

150.    The repeated selection and ultimate ratification of E&Y as HP's auditor by the Company's shareholders causes and caused HP and all its shareholders (including Plaintiff) economic harm since, *inter alia*, E&Y is being and was paid by HP millions of dollars in fees for audits that were not conducted in accordance with GAAS, which it was and is contractually obligated to do.

## **INDIVIDUAL DEFENDANTS' BREACHES OF HP POLICIES**

151.    As directors of the Company, the Board Defendants owed to the Company and its shareholders fiduciary duties of trust, due care, candor, good faith, and loyalty. Each of the Board Defendants knew it was his or her fiduciary duty and responsibility to use his or her utmost ability to oversee the management and administration of HP's business and affairs, to ensure the Company complied with all of its legal obligations and operated in a diligent, honest and prudent manner, and to ensure that effective policies, procedures, systems, and internal controls are (and were) in place to prevent, detect and promptly terminate any unlawful corporate conduct or unethical business practices such as those described above.

152.    HP proclaims that it is "committed to maintaining the highest standards of business conduct and corporate governance, which [the directors] believe are essential to running our business efficiently, serving our stockholders well and maintaining HP's integrity in the marketplace."

153. Even beyond such lofty, but inapplicable proclamation of their business principles, the Board has stated in its "Standards of Business Conduct," ("Standards" or "SBC") which its members have breached:

> Since Bill Hewlett and Dave Packard started our company many years ago, HP has been known not just for the products and services we offer but also for the values we share….We gain trust by treating others with integrity, respect, and fairness….Because HP is committed to getting things done the right way, violations of our SBC or HP policies or rules may result in disciplinary action, up to and including termination of employment.

154. Notwithstanding such Standards and the termination of the employment of former CEO Hurd when the Hurd-Fisher scandal forced the Board to deal affirmatively with Hurd's history of breaches of such Standards, the Board disregarded the widespread payment of bribes in the United States and abroad which Mr. Hurd concealed and, together with Michael Holston, former General Counsel of HP, aggressively caused the stonewalling of the ongoing investigations of the Company by the SEC and DOJ, instead of timely and voluntarily acknowledging HP's very serious wrongdoing.

155. With respect to governmental investigations such as those conducted by the SEC, DOJ and others, the Standards state, *inter alia*:

> "**WE COOPERATE WITH INVESTIGATIONS**"
> Cooperate with all internal investigations and audits.
> **Work with HP Legal to respond to litigation or requests from government and other external agencies.**
> **Tell the whole truth when responding to an investigation and audit."**
> (emphasis added)

156. Notwithstanding such Standards, under the supervision of former CEO Hurd and certain of HP's lawyers, including former General Counsel Holston and outside counsel directed by them, the Company stonewalled United States and foreign investigators of the various briberies referred to above and others which have not yet been disclosed publicly. In dereliction of their duties as directors, none of the culpable persons (including three HP Vice-Presidents)

were disciplined by HP's Board for their breach of the Standards nor were the outside counsel who facilitated such conduct replaced.[8]

157.   The Standards also proclaim falsely that **"We are open, honest and ethical in all of our dealings"** and state, in particular:

> **"WE DO NOT BRIBE**
> **Do not offer or provide bribes or kickbacks to win business or to influence a business decision—anywhere on anything**.
> Use agents and distributors only after they have passed our due diligence process to ensure that our commissions or fee arrangements will not be used as bribes on our behalf." **(emphasis added)**

158.   Notwithstanding such Standards, at least three senior HP executives orchestrated briberies referred to above and in instances not presently disclosed to the public or to HP's shareholders, all of which conduct  has been known or should have been known by HP's Board if its Audit Committee had been functioning and if E&Y had complied with its obligation to audit HP's financial statements  consistent with its contractual and professional obligations pursuant to GAAS. In dereliction of their duties as directors, none of the culpable persons were disciplined by HP's Board for their breach of the Standards nor were those who facilitated such conduct sued by the Company for the damages caused the Company when such facilitators were not *in pari delecto*. To the extent that the Board Defendants allowed applicable statutes of limitation to run which precluded the Company from pursuing legal claims against culpable persons, and such inaction was the result of the failure of the Board to even consider such claims, each of them in office has wasted HP's assets and breached his or her fiduciary duties to it. Similarly, to the extent that the Board gave no consideration to obtaining tolling agreements from the culpable executives, its members have similarly wasted HP's assets and breached their fiduciary duties.

---

[8]  Inasmuch as the underlying wrongdoing appears to have taken years ago, it may be practically impossible for the Company to pursue claims against the three Vice-Presidents and others involved in the FCPA violations due to the expiration of applicable statutes of limitations. The Board was and is responsible for  failing to protect the Company's interests, including obtaining agreements from the miscreants tolling the running of all applicable statutes of limitations.

159.    In connection with the Company's unambiguous Standards regarding bribery, the Board has stated in a Q&A in the Appendix to the Standards:

> Q: Different countries have different cultures and laws. Does our SBC apply worldwide?
> A: Yes. Our SBC establishes principles for business conduct applicable throughout HP, regardless of the location or the particular HP organization or business. Where differences exist on any particular question as a result of local customs. Cultures, or laws, employees must apply either the SBC or local requirements--whichever sets the highest standard of behavior with respect to that question.

160.    Notwithstanding such "principles of business conduct" which were in effect throughout the period of the briberies referred to herein and others not yet disclosed publicly or to HP shareholders, HP executives, subject to the oversight of the Board, orchestrated briberies contrary to such principles. Moreover, each of the sitting members of the Board and their predecessors, despite their knowledge of the extent and nature of the Company's serious violations of the FCPA, acquiesced in the concealment of material facts with respect to such wrongdoing through the present and legal counsel's obstruction of the investigations of HP's conduct until such time as the Company began, belatedly, cooperating with at least some investigators.

161.    With respect to the use of HP's corporate assets, the Standards state, inter alia:

> "WE USE ASSETS WISELY
> Keep personal use of H-P assets to a minimum.
> Do not allow other people, including friends and family, to use HP resources.
> Uphold your responsibility to protect HP financial assets."

162.    Notwithstanding such Standards, until the Board was forced to deal with the Hurd-Fisher Scandal in June 2010 when Gloria Allred, Esquire, Ms. Fisher's counsel, made it impossible to look the other way, the Board long-tolerated former CEO Hurd's "business trips" (accompanied by Ms. Fisher) charged to the Company and took no action to prevent his own padding of his expense accounts or the expenses charged by Ms. Fisher to HP. In dereliction of

their duties as directors, other than Hurd who was belatedly terminated, none of the culpable persons were disciplined by HP's Board for their breach of the Standards.

163.    Notwithstanding such Standards, the Board recklessly wasted HP's assets by authorizing the acquisitions of EDS, 3Par, and Autonomy, effectively abandoning rational business judgment that the prices paid for such acquisitions were grossly excessive and irrational.[9] In dereliction of their duties as directors, none of the culpable persons, including the members of the Board who approved such acquisitions, were disciplined by HP's Board for their massive and not-yet-realized waste of HP's assets and their breach of the Standards.

164.    Pursuant to HP practices over many years since the founding of the Company, all of its directors were well supported by accurate and timely information and were provided with sufficient time and resources to fully attend to all of their crucial oversight responsibilities.  HP's directors had unrestricted full and free access to officers and employees of the Company.

165.    Through their service on key Board committees, the non-employee members of the Board had supervisory responsibility for crucial front-line oversight in the areas of internal controls, legal and regulatory compliance, corporate citizenship, risk management, corporate governance and Board effectiveness.   Notwithstanding such responsibility, critical to the effective governance of the Company, these purportedly independent Directors, spent insufficient time on HP's business including, in particular, the consideration and evaluation of multi-billion dollar potential acquisitions  and internal controls. Service on these key committees as well as service as a Director of the Company generally necessarily exposed these Directors to knowledge of the individual instances, and overall pattern, of unlawful business practices reflected in this Complaint, as well as to knowledge of the Board's consistent ineffectiveness in assuring management's prevention of such unlawful business practices.

---

[9] For reasons not clear other than the existence of pre-existing business and other relationships unrelated to HP, the members of the Board and HP's legal counsel allowed themselves to be persuaded by Frank Quattrone in connection therewith.

166. The Board's Audit Committee was responsible at all relevant times for being the Board's "front line" in the oversight of enforcement of the Standards and the Company's more generalized governance policies including the monitoring of all compliance programs (including its stated anti-bribery Standards) and reports from the Company's internal audit function concerning management improprieties such as the briberies and the misuse of corporate assets as referred to above. The Audit Committee was required to report regularly to the full Board concerning its meetings and discussions and to review with the full Board all significant issues and concerns arising at its meetings. Therefore, the members of the Audit Committee received regular reports both of supposed compliance program activities and of unlawful and unethical business practices such as the briberies referred to herein, with respect to the Company and all of its operating subsidiaries, and reported these matters and the "stonewalling" of governmental investigations of such conduct to the full Board. Similarly, each Audit Committee had firsthand knowledge that HP concealed material facts with respect to such investigations and the likely consequences thereof from HP shareholders, the investing public and in filings with the SEC.

167. Each of the Board Defendants, including each of the present members of the Board, knew that as Directors of HP, it was their fiduciary duty and responsibility to oversee management to assure that it acted effectively to prevent unlawful and unethical business practices, and to promptly cause the termination of any existing unlawful and unethical business practices such as those described. They also knew that it was a violation of their fiduciary duty of loyalty and good faith to permit the continuation of any such unlawful and unethical business practices, once they became aware of them. They were aware at all relevant times of the unlawful and unethical business practices alleged herein, including their cover-up to this day, yet permitted them to be continued, year after year, thus committing knowing breaches of their fiduciary duty of loyalty, candor and good faith. At all relevant times during each of their tenures

on the Board, as a result of their service on the Board and on the committees described more fully in HP's 2013 and 2014 Proxy Statements, their knowledge and expertise as alleged therein, the receipt by the Board and those committees of regular, complete and accurate reports, the sustained and systematic nature of the wrongdoing over multiple years, and as reflected in the Company's recent disclosures, each of the Board's members was aware of the unlawful business practices described herein, which conduct was not the result of a rogue employee or division, but instead, notwithstanding the Standards, reflected a Company-wide business philosophy, employed with consistent methods over extended multi-year periods of time, to maximize sales through the payment of bribes in violation of the FCPA and other similar laws.

168.    Thus, the Board, as a *de facto* matter of policy, manifested over and over again in the various bribery schemes alleged herein, consistently elevated revenues and profits over compliance with laws and regulations designed to protect the Company and its shareholders. Upon information and belief, this strategy was well known to HP's senior management and its Board, and was knowingly pursued despite their knowledge of its illegality and/or cover-up and the inevitable harm to HP. The Company's management, accompanied by Board acquiescence, knowingly made a calculated bet that any legal consequences from the bribery schemes described herein would be insignificant when compared to the increased sales, profits, and cash flows that were expected to result from their unlawful strategy and practices.  By knowingly or negligently permitting this strategy to continue, the Board adopted it as Company policy, and committed a sustained and systematic failure of compliance oversight in breach of its members' fiduciary duty of loyalty and good faith.

169.    Each of HP's directors has acquiesced or actively participated in at least some of the wrongful conduct described herein, including acquiescing in the cover-up of serious wrongdoing, thereby breaching his or her fiduciary duty of loyalty and good faith.  Such conduct

is not the product of a valid exercise of business judgment, and constitutes a non-exculpable breach of fiduciary duty for which each director faces a substantial threat of personal liability. Moreover, each of the Board Defendants ignored numerous "red flags" which demonstrated to them, *inter alia*, that HP executives had engaged in massive bribery schemes over at least a 10-year period and the other illegal conduct described herein, the cover-up of which they acquiesced. Their failure of oversight is demonstrated by the fact that, over a multi-year period, they took no steps to disclose HP's bribery promptly to the DOJ and SEC as they were legally required to do or to otherwise mitigate the wrongdoing by "owning up to it," thus lessening any likely penalties and fines.

170.    To the extent that any of the Board Defendants, while serving on HP's Board, claim that they were not knowledgeable of the fact and/or truth of any of the claims of illegal conduct or wrongdoing referred to herein that were violations of, *inter alia*, the FCPA, each was informed of and acquiesced in management's "stonewalling" of the DOJ, the SEC and other agencies investigating the Company's conduct through at least 2010 if not thereafter and the cover-up of such conduct through and including the present, all of which has further damaged and will continue to damage HP.

171.    In light of the facts known to each of HP's Directors as a result of the reporting systems and procedures described above, the Board was on notice that widespread wrongdoing had been taking place throughout the Company as described herein and in the *Copeland I* action. The Board's bad faith failure to act to investigate and/or to prevent such wrongdoing reflected a systemic flaw in HP's corporate governance during a decade of CEO and Board-level upheavals, changes of direction and confusing or non-existent long range plans.

# DERIVATIVE ALLEGATIONS

### A.      General Derivative Allegations

172.    Plaintiff brings this action derivatively in the right and for the benefit of HP to redress the breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and other wrongful conduct by the Board Defendants as alleged herein.

173.    Plaintiff owns and has continuously owned common stock in HP beneficially since 1999 and throughout the wrongdoing alleged herein.

174.    This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

175.    Plaintiff will adequately and fairly represent the interests of HP and its shareholders in enforcing and prosecuting its rights, and has retained counsel experienced in prosecuting this type of action.

### B.      Plaintiff has Made Pre-Suit Demands Pursuant to Rule 23.1

176.    On August 23 and 28, 2010, Plaintiff made pre-suit demands on the Board as required by Fed. R. Civ. P. 23.1. Copies of the letters from one of Plaintiff's counsel setting forth such demands (the "2010 Demand Letters") are attached hereto as Exhibits "A" and "B."

177.    In purported response to the 2010 Demand Letters, the Board appointed a so-called "Independent Committee" to investigate the claimed wrongdoing and to recommend to the Board whether to pursue the demanded litigation.

178.    The Board's first "Independent Committee" purportedly hired Dechert and one of its senior partners, Levander, to conduct a purported "investigation" which was not carried out in good faith but merely was a strategy concocted by HP's in-house and outside counsel to provide a pretext to whitewash egregious wrongful conduct and to provide a means to seek the dismissal of any potential shareholder derivative suit that might be commenced. In fact, upon information

and belief, notwithstanding false representations to the Court by HP's counsel as to the purported independence of the first "Independent Committee," it did not retain Mr. Levander and Dechert, as they were initially contacted by former HP General Counsel Holston, who had a longstanding personal friendship and professional relationship with Mr. Levander. In selecting Mr. Levander to represent the yet-to-be formed "Independent Committee," Mr. Holston wanted counsel for such committee to be amenable to his personal goal; i.e. protecting the then Board members and senior officers from personal liability for the wrongdoing alleged by Plaintiff Copeland and others.[10] Mr. Levander and Dechert, without being told specifically what their mandate was, in fact, knew what they were hired to do, and performed precisely to Holston's expectations. [11]

179.    As expected, Mr. Levander and Dechert, which aided and abetted the wrongful conduct of the individuals whom it was purportedly investigating, recommended rejecting Plaintiff's demands, and such rejection was "rubber-stamped" first by the "Independent Committee" and then by the Board as a whole.

180.    The Board, the "Independent Committee" and HP's legal counsel caused substantial sums to be paid to Mr. Levander and Dechert wastefully, against HP's best interests, and for which the Company received no benefit. The only beneficiary of the investigations carried out by Mr. Levander and Dechert were the members of HP's Board and those senior officers implicated in the alleged wrongdoing which the "Independent Committee" whitewashed.

181.    On July 12, 2013, Plaintiff made pre-suit demands on the Board as required by Fed. R. Civ. P. 23.1. A copy of the letter from one of Plaintiff's counsel setting forth such demands (the "2013 Demand Letter") is attached hereto as Exhibit "C".

---

[10] After learning of the appointment of Levander and Dechert, Plaintiff's counsel asked Mr. Levander, *inter alia,* on February 11, 2011, when and by whom he was first contacted to serve in the role he and his firm  ultimately accepted as counsel to the "Independent Committee." He refused to provide such information which could have established his *bona fides,* if indeed, they existed.
[11] The "Independent Committee" did no investigating itself and all its work was performed by Mr. Levander and Dechert.

182.    In making the demands set forth in the 2013 Demand Letter, Plaintiff was in no way conceding the dis-interestedness or independence of any of the HP directors (nor does he now concede such with respect to the directors selected after such dates) or even asking the Board to undertake an investigation.  Indeed, since the members of the Board were aware, at all times, of the material wrongdoing alleged herein, no investigation of wrongdoing was necessary.  Rather, the pre-suit demand was made to give the Board the first opportunity to assert the claims directly, in the first instance, that Plaintiff now asserts derivatively.

183.    The HP Board did not substantively respond to the 2013 Demand Letter.

184.    Not having received any substantive response to the Demand Letter sent seven months earlier, by letter dated January 6, 2014, attached hereto as Exhibit "D", Plaintiff's counsel followed up to determine if the Board was investigating any of Plaintiff's claims or had constructively rejected them.[12]

185.    Steven Schatz, counsel for HP, presumably acting on behalf of the Board, responded by email dated January 7, 2014 stating that the Company sent a letter dated August 9, 2013 which informed Plaintiff's counsel that:

> it would be inappropriate for you or your clients to initiate any new lawsuits on HP's purported behalf.  First, the claims you seek to bring were already litigated by you in the Copeland matter, which, as you reference, is currently on appeal in the Ninth Circuit.  Second, as you also know, there is already a consolidated shareholder derivative action related to the Autonomy transaction which is currently pending before Judge Breyer in the Northern District of California.

186.    Counsel for Plaintiff responded by email dated January 7, 2014 as follows:

> The HP Board has yet to respond substantively to the demands as specifically set forth in my letter to it of July 12, 2013. While you can argue that each member of the current Board can rely on the rejection of the earlier demands by our clients, both constructive and ultimately, actual, that is simply an argument that you are free to make. Moreover the

---

[12] Plaintiff's counsel stated that he planned at that time to only pursue the claims related to the Autonomy acquisition and to those claims being investigated by the SEC and DOJ through document requests or otherwise pending  ultimate resolution of these claims.

July 12 letter raises a number of additional facts, circumstances and claims outside the scope of the Copeland case on appeal. In particular, defendants previously argued that the Autonomy-related issues were not made in the Copeland case. Moreover none of the pending Derivative suits arising out of the Autonomy debacle is premised on a pre-suit demand being made on HP's Board. In fact every shareholder alleged demand futility, materially different factually and legally in terms of ultimate consequences.

187.    Neither Mr. Schatz nor anyone else representing the Board or HP responded to this latter email.

188.    In January 2013, HP's counsel or its Board, as directed by counsel, appointed three Board members – Defendants Whitworth, Reiner and Bennett -- to a new so-called "Independent Committee" to review the Autonomy claims alleged in "demand futile" shareholder derivative litigation pending in this Court, in state court and as alleged in *Copeland I*. Although two of the Committee's members are relatively new Directors of HP, all three Directors cannot be seriously regarded as disinterested or independent. Each, despite his personal knowledge of the full nature and scope of HP's FCPA and other serious violations of law, as well as the financial and reputational consequences thereof, has kept such material facts concealed from the Company's shareholders and the public at large. Similarly, with regard to the Autonomy acquisition, each of such Directors has been aware of the nature, scope and magnitude of the wrongdoing of their fellow Directors and the participation therein by Defendant Reiner and Whitworth, but has, as well, concealed such material facts from HP shareholders and the public. By actively participating in such cover-ups, not one of them can be considered disinterested or independent for the purposes of evaluating the claims made by Plaintiff in his 2013 Demand Letter or otherwise.

189.    The new "Independent Committee's" review also included Autonomy-related claims alleged in Plaintiff's 2013 Demand Letter as well as similar pre-suit demand letters sent to the Board by many other HP shareholders. The "Independent Committee's" principal lawyer,

Mr. Ferrara, persuaded the Court to put the derivative case "on hold" until the Committee completed its work and made a recommendation to the Board on how to proceed. On September 6, 2013, the Court extended the time to submit a recommendation to January 17, 2014, which has since been extended further to February 28, 2014.

190. By email dated January 21, 2014, Plaintiff's counsel requested a copy of the Committee report regarding the Autonomy claims which the Court had expected to be produced by January 17, 2014. Additionally, Plaintiff's counsel asked: "Will we be receiving any formal response to the two most recent Demand Letters sent by me on behalf of our client, Andrew Copeland?"

191. There was no substantive response by the Board to such email. However, on January 31, 2014, Plaintiff's counsel received a letter from Mr. Ferrara informing him that the Committee had completed its factual "findings and recommendations" by January 7, 2014, which were then transmitted to the purportedly "independent and disinterested" members of the Board a week later for a "determination," which was made thereupon on January 16, 2014.

192. None of HP's directors is dis-interested and/or independent with respect to the wrongdoing alleged in Plaintiff's 2013 Demand Letter or herein, particularly since each has, *inter alia*, acquiesced in the continuing cover-up of HP's FCPA violations and their consequences as well as the scope of the wrongdoing of the Board in connection with the Autonomy acquisition.

193. However, as distinct from the process employed by the Board in connection with Plaintiff's 2010 Demand Letters, although a purportedly "Independent Committee" of the Board was again charged with investigating these claims, counsel was retained that, unlike Mr. Levander and Dechert, was determined to uncover the truth and to make recommendations in HP's best interests.

194.    In particular, the Board's most recent iteration of a "standing committee," the new "Independent Committee" had retained Mr. Ferrara, a well-respected expert on corporate governance issues and he and others at his law firm (collectively "Mr. Ferrara") were charged with the actual responsibility for carrying out the necessary investigation of the Autonomy fiasco.  Upon information and belief, following an extended investigation, Mr. Ferrara concluded and prepared a draft report to the "Independent Committee" concluding that HP's former CEO, Defendant Apotheker, and certain professionals, were negligent in connection with the Autonomy acquisition and that Defendant Lynch and others at or employed by Autonomy had defrauded HP in connection therewith. Such report formed the basis of factual "findings and recommendations" made by the "Independent Committee" to the Board, transmitted to its purportedly "disinterested and independent" members between January 7 and 15, 2014.

195.    With knowledge of what the "Independent Committee" reported and recommended, HP's Board, to protect its members at the time of the Autonomy acquisition, and their present and former colleagues from personal liability in connection with, *inter alia*, the cover-up of the Autonomy debacle's causes and consequences, determined to try and keep the Committee's factual "findings and recommendations" from being made public to HP shareholders and otherwise.  Since, unlike Dechert, which was willing to give the former CEO and HP's Board a "free pass," Mr. Ferrara was not prepared to do so. Thus, in an effort to keep the truth concealed from Plaintiff and all other HP shareholders, the Board members and their insurance carriers determined to try and quickly settle all of the Autonomy claims alleged by Plaintiff and the other HP shareholders pursuing the same claims in pending derivative suits. Thus, Plaintiff's Autonomy-related demands upon the Board have been constructively rejected. Similarly, the Board has, upon information and belief, taken absolutely no action on the non-Autonomy-related claims set forth in the 2013 Demand Letter.  As such, the remainder of the

demands claimed therein have also been constructively rejected.  Accordingly, having had his pre-suit demands on the Board constructively rejected, he is free to pursue his claims derivatively and he does so herein.

### DAMAGES SUFFERED BY HP

196.    The Board and senior management of HP failed to act in accordance with any legitimate exercise of business judgment and consistently with the fiduciary duties owed by them to HP and its shareholders.

197.    As a result of the Board Defendants' breaches of their fiduciary duties as described herein, HP has suffered and will continue to suffer substantial harm to an extent not yet fully capable of determination.

198.    In addition, the Board Defendants' breaches of their fiduciary duties to the Company have also exposed HP to substantial injury to its reputation and corporate goodwill, as well as to potential criminal and civil liability.

199.    HP's directors utterly failed to implement validly functioning reporting, control and information systems so that each Board member was timely informed of the wrongdoing alleged herein including, *inter alia*, HP's serious violations of the FCPA.  In addition, it is clear that the HP Board consciously or recklessly failed to monitor or oversee the Company's operations, or the offering prices for potential acquisition candidates and otherwise.

200.    The consideration HP received from the acquisitions of 3PAR, EDS, and Autonomy was materially inadequate as to constitute corporate waste under applicable law, particularly under the circumstances under waste.

201.    The wrongdoing of each of the Board Defendants as described herein was an essential link in the damages caused to HP and its shareholders as a result thereof.

## REQUEST FOR APPOINTMENT OF SPECIAL MASTER

202.    The Company has been the subject of far-reaching and serious investigations with respect to the wrongdoing alleged herein, including multi-year investigations by the SEC and DOJ.

203.    Because the Company's Board suffers massive conflicts of interest due to the personal culpability of Board members and their former colleagues, the members of the Board are not capable of advancing solely the Company's interests and not their own. Moreover, the legal counsel acting for HP similarly have not acted exclusively in the Company's best interests in dealing with the foregoing investigations, in connection with possible resolution of claims against HP, and in seeking the dismissal of pending shareholder derivative suits. Based upon the facts and circumstances described herein, it is a virtual certainty that the members of the Board and their legal counsel as well as the Company's counsel, will not deal with this litigation objectively and solely in the Company's best interests.

204.    In order that the Company's interests be addressed to the exclusion of all others, Plaintiff requests the appointment by the Court of a Special Master to oversee the Company's dealings with the DOJ, the SEC and any other agencies investigating HP in connection with the wrongdoing alleged herein and in connection with the Company's response to this litigation in order that the Company's interests are put before all others and are not compromised by the defense of the Board Defendants and/or material conflicts of interest on the part of their legal counsel. Should the Company's interests continue to be represented as they are at present by conflicted counsel whose principal allegiance is to the Board Defendants, HP will be irreparably harmed.

1

2

## **COUNT I**

3

### **(For Violations of Section 14(a) of the Exchange Act)**

4

205.     Plaintiff repeats and re-alleges each and every allegation contained above as if

5

fully set forth herein.

6

206.     This claim is asserted by Plaintiff individually against the Board Defendants who

7

were members of the Company's Board of Directors when the 2013 and 2014 Proxy Statements

8

were issued and disseminated to HP shareholders, for violations of Section 14(a) of the

9

Exchange Act and SEC Rule 14a-9 in connection therewith. Such claims arise from the Board's

10

violation of Plaintiff's personal suffrage rights as an HP shareholder. But for the foregoing

11

violations of applicable federal disclosure requirements, HP's shareholders would not have voted

12

as they did, with a majority voting in favor of the Board's recommendations.

13

207.     The 2013 and 2014 Proxy Statements solicited the votes of Plaintiff and the other

14

HP shareholders in connection with, *inter alia*, the election/re-election of the members of the HP

15

Board, the retention of E&Y as HP's auditor, and the approval of executive compensation

16

proposals.

17

208.     The Board, through the 2013 and 2014 Proxy Statements issued and disseminated

18

by it,, recommended that HP shareholders vote in favor of each of the Board's proposals and, in

19

particular, in favor of the re-election of members of the Board.

20

209.     The 2013 and 2014 Proxy Statements contained untrue statements of material fact

21

and omitted other facts necessary to make the statements made not misleading, and failed to

22

disclose material facts as more fully set forth above.   In particular, each of such Proxy

23

Statements failed to disclose material information regarding the nominee directors, and E&Y as

24

set forth above.

25

26

27

28

210.    These deceptions frustrated Plaintiff's suffrage rights as an HP shareholder and proximately caused Plaintiff direct and indirect economic and other damages in an amount which cannot presently be determined.

211.    As a result of the use by the Company's Board of Directors of the 2013 and 2014 Proxy Statements to solicit the votes of HP shareholders, which Proxy Statements failed to disclose the material facts set forth herein, the Board's director nominees, and proposals to retain E&Y were approved in 2013 and are likely to be in 2014.

212.    By utilizing such Proxy Statements, the suffrage rights of Plaintiff and each other shareholder of the Company have been violated, which conduct is in violation of Section 14 (a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

### (For Violations of Section 14(a) of the Exchange Act)

213.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

214.    This claim is asserted by Plaintiff derivatively on behalf of HP against the Individual Defendants who were members of the Company's Board of Directors when the 2013 and 2014 Proxy Statements were issued and disseminated to HP shareholders, for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 in connection therewith.  Such claims arise from the Board's violation of the personal suffrage rights of Plaintiff and other HP shareholders, which caused and is causing damage to the Company.  But for the foregoing violations of applicable federal disclosure requirements, HP's shareholders would not have voted as they did, with a majority voting in favor of the Board's recommendations in 2013 and are likely to vote similarly at the Company's 2014 Annual Meeting.

215.   These deceptions frustrated the suffrage rights of Plaintiff and all other HP shareholders and proximately caused HP direct and indirect economic and other damages in an amount which cannot presently be determined.

216.   As a result of the use by the Company's Board of Directors of the 2013 and 2014 Proxy Statements to solicit the votes of HP shareholders, which Proxy Statements failed to disclose the material facts set forth herein, the Board's director nominees, and proposals to retain E&Y were approved.

217.   By utilizing such Proxy Statements, the suffrage rights of Plaintiff and each other shareholder of the Company have been violated, which conduct is in violation of Section 14 (a) of the Exchange Act and SEC Rule 14a-9.

## COUNT III

### (For Violations of Section 10(b) of the Exchange Act)

218.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

219.   This claim is asserted by Plaintiff derivatively on behalf of HP against Defendants Lynch and Apotheker, who defrauded HP in connection with the sale to it of Autonomy's shares, all of which violated of Section 10(b) of the Exchange Act and SEC Rule 10b-5 in connection therewith.   In particular, such claims are asserted against Defendant Lynch, who was primarily responsible for such fraud and Defendant Apotheker, who aided and abetted him and facilitated the fraud upon HP.   These claims are alleged herein because, to the best of Plaintiff's knowledge, no such claims have yet to be brought by HP nor has it disclosed the existence of any agreement to toll the running of any applicable statutes of limitations.

220.   The claims set forth herein can and will be further particularized upon production of the "Independent Committee's" "Findings and recommendations" which, upon

information and belief, set forth highly detailed facts in support of such liability.

221. Such claims against Defendant Lynch include, *inter alia*: the fact that he masterminded the inflation of revenue in material amounts at Autonomy Systems, Ltd. In 2010 and 2011 by prematurely booking transactions that he knew or should have known would never be consummated and claiming the existence of transactions where there were no end customers in existence.

222. Such claims against Defendant Apotheker include, *inter alia*, his concealment from the HP Board of material facts regarding Autonomy's improper revenue recognition practices and other wrongdoing as alleged above, all of which led the Board to approve and proceed with the consummation of the acquisition.

223. Defendants Lynch and Apotheker, misrepresented material facts to HP and its Board and concealed and failed to disclose other material facts necessary to be disclosed.

224. In connection with the foregoing violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, HP has sustained more than $8 billion in damages, for which Defendants Apotheker and Lynch should be held accountable.

## COUNT IV

### (Breach of Fiduciary Duty and Waste of Corporate Assets)

225. Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

226. The Board Defendants all owed and/or owe fiduciary duties to HP and its shareholders. By reason of their fiduciary relationships, the Board Defendants specifically owed and owe HP the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including the oversight of HP's compliance with federal laws such as the FCPA and similar local laws. Moreover, the Board had specific fiduciary duties as defined by the Company's key corporate governance documents and principles that, had they been discharged

1    in accordance with the Board's obligations, would have necessarily prevented the misconduct

2    and consequent harm to the Company alleged herein. The Board Defendants *de facto* ignored

3    and/or disregarded such governance documents and principles as set forth above.

4           227.  The Board Defendants consciously violated their corporate responsibilities in at

5    least the following ways: (a) affirmatively and repeatedly declining to stop, prevent and

6    ultimately make timely voluntary disclosure of HP's illegal payment of bribes after receiving

7    reports of such illegal activity and "red flags" indicating such widespread illegality, and/or

8    consciously disregarding such reports and activity, consciously covering up the wrongdoing

9    when they became aware of it, and acquiescing in the "stonewalling" the SEC, the DOJ and

10    others investigating such illegal conduct despite specific HP policies requiring cooperation in

11    such investigations; (b) wasting enormous amounts of the Company's assets by authorizing

12    management to engage in reckless acquisitions of 3Par, EDS, and Autonomy for grossly

13    excessive prices; (c) failing to implement a CEO succession plan, and recklessly hiring and firing

14    CEOs resulting in enormous corporate waste in the form of millions of dollars in severance

15    payments and otherwise; and (d) wasting corporate assets by hiring Mr. Levander and Dechert to

16    perform a "whitewash" investigation into the claims alleged in Plaintiff's 2010 Demand Letters,

17    for which the Company received nothing of value in return. As a direct and proximate result of

18    the Board Defendants' conscious failure to perform their fiduciary obligations and wastage of

19    HP's assets, the Company has sustained and will sustain significant damages, not only

20    monetarily, but also to its corporate image and goodwill.

21           228.  As a result of the misconduct alleged herein, the Board Defendants are liable to

22    the Company in an amount which cannot presently be determined.

**COUNT V**

**(Unjust Enrichment)**

229.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

230.     Defendant Apotheker has been unjustly enriched by reason of the excessively generous employment and severance packages given to him by the Board, particularly since he should have been terminated by the Board for "cause" rather than being allowed to resign..

231.     Each of the Board Defendants was unjustly compensated by HP with fees and otherwise despite the failure of their stewardship of the Company and their personal implication in the wrongdoing set forth herein.

232.     Each of the Board Defendants who have been unjustly enriched by the wrongdoing set forth in this Complaint should repay the Company therefor together with their earnings thereupon.

**COUNT VI**

**(Breach of the Duty of Candor)**

233.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

234.     Each of the sitting Directors of the Company at the time of the issuance and dissemination of the 2013 and/or 2014 HP Proxy Statements, by reason of the fact that each such proxy statement was false and misleading as described herein, breached his or her respective duty of candor owed to HP, Plaintiff and the Company's other shareholders.

235.     For the reasons set forth with respect to Plaintiff's proxy fraud claims, he is entitled to injunctive relief as set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Appointing a Special Master to oversee and direct (1) the Company's negotiations with the DOJ and the SEC with respect to the wrongdoing alleged herein; and (2) to act in place of HP's Board in connection with the Company's response to this litigation or any other pending shareholder derivative litigation in which one or more of the presently-sitting Directors of HP is named as a defendant;

B.    Determining that HP's 2013 and 2014 Proxy Statements are false and misleading in violation of §14(a) of the Exchange Act and the Board's duty of candor and declaring each of them null and void and ordering a new Annual Meeting of Shareholders or special meeting of shareholders after the preparation and distribution of a replacement proxy statement prepared in compliance with all federal disclosure laws and rules;

C.    Declaring that the current and former directors of the Company named as defendants herein have breached their fiduciary duties as alleged herein causing substantial damages to HP;

D.    Requiring the Board Defendants to pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

E.    Requiring the Board Defendants to repay the Company to the extent they have been unjustly enriched by their wrongful conduct as described herein together with their earnings upon such amounts;

F.    Ordering the Board to take all necessary actions to reform and improve HP's corporate governance, compliance and internal control procedures for the purpose not only of preventing a recurrence of the failures detailed above, but to optimize such procedures in light of relevant and current best practices;

G.    Ordering the Board to appoint a Chief Compliance Officer with specific responsibility for overseeing and enforcing HP's compliance with the FCPA, the Sarbanes-Oxley Act, and applicable federal securities laws;

H.    Awarding Plaintiff and his counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

I.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: February 10, 2014                    /s/ Ilene F. Brookler

Ilene F. Brookler, #269422
Richard D. Greenfield
Marguerite R. Goodman
GREENFIELD & GOODMAN, LLC
250 Hudson Street, 8th Floor
New York, NY 10013
Tel: (917) 495-4446
Fax: (212) 355-9592
ibrookler@gmail.com
whitehatrdg@earthlink.net
twowhitehats@earthlink.net

Rose F. Luzon #221544
SHEPHERD, FINKELMAN,
MILLER & SHAH, LLP
One California Street
San Francisco, CA 94111
Tel: (415) 429-5272
Fax: (866) 300-7367
rluzon@sfmslaw.com

Scott R. Shepherd
SHEPHERD, FINKELMAN
MILLER& SHAH, LLP
35 E. State Street
Media, PA  19063
Tel: (610) 891-9880
Fax: (866) 300-7367
sshepherd@sfmslaw.com

**Counsel for Plaintiff**

# Exhibit A

**GREENFIELD & GOODMAN LLC**
**ATTORNEYS AT LAW**
**250 Hudson Street**
**8th Floor**
**New York, NY 10013**
**(917) 495-4446**
**Fax (212) 355-9592**
email: **whitehatrdg@earthlink.net**

**Richard D. Greenfield**
*Also admitted to the Maryland*
*and Pennsylvania Bars*

August 23, 2010

Board of Directors
Hewlett-Packard Company
3000 Hanover Street
Palo Alto, CA 94304

Via FedEx Tracking No. 8710-6420-9075

Dear Members of the Board:

I am writing to you on behalf of my clients,  Andrew J. Copeland and Martha J. Copeland, who presently own, and who have owned continuously since 1999, shares of the common stock of Hewlett-Packard Company ("H-P" or the "Company"). A copy of the relevant page and portion of my clients' brokerage statement showing their current ownership of H-P shares is enclosed with this letter.

On behalf of my clients, I demand that the Company sue the Company's former CEO, Mark V. Hurd; the Company's legal counsel who were responsible for the drafting of Mr. Hurd's employment contract with H-P; Jodie Fisher; the Company's officers and other executives involved in the direct and indirect payment of bribes and otherwise violating the Foreign Corrupt Practices Act; and other wrongful conduct as set forth below and each of you for acquiescing in and/or covering up such conduct and causing and/or sitting idly by while the Company concealed its likely exposure in the wake of such conduct. All of such conduct has caused and will continue to cause the Company and its shareholders massive economic damages and further damage to its reputation in amounts which cannot be presently calculated. Similarly, your actions and those of Mr. Hurd

1

caused internal morale problems that will not quickly fade away. According to Ms. Eleanor Bloxham, President of the Corporate Governance Alliance: "It's a really serious issue for the company in terms of morale and culture." The Company's founders, Messrs. Bill Hewlett and David Packard, whose reputations for integrity were beyond reproach and are remembered for their high ethical standards that permeated H-P's culture, must be turning over in their graves as a result of the conduct described below.

### The Hurd-Fisher Scandal:

As you are all well aware, you recently asked for and received the resignation of Mr. Hurd in connection with, among other reasons, his highly publicized relationship with Ms. Fisher involving sexual harassment, inappropriate sexual advances and, admittedly, an inappropriate relationship between the participants, including his submission of unjustified expense reports related to such relationship and otherwise. Although the underlying conduct of Mr. Hurd and Ms. Fisher, about which you were aware for more than six weeks prior to public disclosure, have caused the Company substantial investigative, public relations and other expenses which should be borne by the two of them,  the request for his resignation purportedly on these grounds appears to have been merely a pretextural story line for public consumption intended to conceal far more serious wrongdoing on the part of Mr. Hurd and his subordinates.

Ms. Fisher has apparently been compensated by the Company for services of questionable value and/or which were never rendered and inappropriately reimbursed for expenses, all of which compensation Mr. Hurd directly or indirectly approved. Further, despite his enormous personal compensation, according to Michael Holston, Esq., H-P's General Counsel, Mr. Hurd had a "systematic pattern" of padding his own expense accounts. Such padding was carried out directly or through his assistant, Ms. Caprice Fimbres McIlvaine.

This misappropriation of the Company's funds by both Mr. Hurd and Ms. Fisher must be remedied, particularly in the context of H-P's "going away" gift to Mr. Hurd in cash and H-P stock, variously valued at $30-50 million.  At minimum, these amounts should be offset against that "gift."According to credible media accounts, such severance payment is the result of a poorly drafted employment contract, drafted in substantial part by the Company's lawyers.

It appears that they negligently failed to provide therein a commonly used "escape clause" which would have relieved H-P from such payments upon the occurrence

of the conduct which resulted in Mr. Hurd's resignation, conduct that is traditionally referred to as "cause." To the extent such unjustified payments are the result of negligent drafting of Mr. Hurd's employment agreement by H-P legal counsel, the responsible lawyers should be held accountable to the Company.

In the context of the facts referred to herein, negotiations between the Board and Mr. Hurd regarding his resignation, the likely outcome of those negotiations and the retention of a public relations firm, APCO Worldwide, you intentionally concealed material facts from the investing public. You thereby subjected the Company to claims by those who invested in its stock during the period of approximately June 29 to August 6, 2010. Each of you is personally implicated in such concealment which, given the materiality of the underlying facts, was and is a violation of the federal securities laws, your duty of candor and your fiduciary duties to the Company and its shareholders more generally.

The materiality of the concealed facts is reflected in the elimination of $8.7 billion in market value as a result of the 8% decline in the closing price of H-P common stock on August 9, 2010. The shares have fallen further since August 9. While some of such deterioration will, most likely, be erased, the claims of those who invested during the period of your active concealment are undoubtedly very substantial. To the extent that H-P is sued based upon such claims, since they would be based upon your and Mr. Hurd's failure to disclose in a timely manner the material facts referred to above, each of you and Mr. Hurd should be held personally accountable to the Company. Any attempted indemnification of you or him by the Company under such circumstances would be inappropriate and a waste of corporate assets.

**Bribery, Kickbacks and Illegal Rebates:**

Far more serious than the Hurd-Fisher scandal, as you well know, is the fact that H-P officers and other executives have been involved in paying bribes, directly and indirectly, purportedly as a means of obtaining business in Russia and elsewhere in the world, in violation of the Foreign Corrupt Practices Act ("FCPA") and local anti-corruption laws. For example, German prosecutors have been investigating whether one current and two former H-P executives and others affiliated with them paid approximately $10 million in bribes in an attempt to obtain a contract to supply computers and related software in Russia, where local officials raided the Company's Moscow offices in April. The Company initially "stonewalled" the German prosecutors and now claims that it is cooperating with the investigation in

3

this country and abroad. In light of the foregoing conduct by the culpable executives, whose identities are presently unknown to H-P shareholders, the Company has been required to pay and will continue to pay substantial legal and other expenses. Further, as a result of these violations of the FCPA and other laws, the Company is likely to be penalized substantially by the SEC and other governmental agencies in amounts which cannot presently be estimated but which are likely to be substantial. The culpable executives should be required to pay personally any fines or penalties that are sought against H-P. In addition, they must be sued by the Company for all of the expenses incurred by it to date as a result of their illegal conduct.

As you know, having approved it previously, the Company agreed in principle to a settlement with the Department of Justice to resolve an investigation into H-P executives' violations of the Anti-Kickback Act of 1986 in connection with the GSA Multiple Award Schedule contract. The proposed settlement would also resolve separate "whistleblower" allegations associated with the *Rille* Complaint filed in the United States District Court for the Eastern District of Arkansas in 2007. The wrongful acts of H-P executives (together with co-conspirators) included submitting claims inflated by paying kickbacks, illicit fees and rebates, to Accenture PLC (formerly known as Arthur Andersen Consulting), in exchange for its recommending the Company for government contracts. In connection with the proposed settlement, H-P expects a negative impact of approximately $46.6 million after tax on its third quarter fiscal year 2010 earnings per share. The Company, through its legal counsel and spokesmen, has denied engaging in any illegal conduct in connection with these matters. However, you have long-known or should have known that executives of the Company are personally responsible for the activities which resulted in the government's suit. Presumably with your blessing, the Company negotiated this settlement to avoid having the culpable executives pay the expenses thereof including the costs associated with H-P's legal expenses. By so doing, each of you is wasting the Company's assets and, on behalf of my clients, I demand that the Company sue each of you to recover its damages. I further demand that H-P sue Accenture to recover the money illegally paid to it in connection with the government contracts it purportedly facilitated.

Additionally, in what appears to be a pattern of H-P executives paying bribes and making improper gifts, executives have conspired with Frankie Wong and his company, Micro Systems Engineering, to provide gifts to employees of the Houston and Dallas, Texas Independent School Districts, all of which is subject to another ongoing investigation by the Department of Justice. I hereby demand that the Company sue each of the responsible executives in connection with these and

4

other misuses of H-P assets to recover the Company's damages.

The SEC is investigating H-P executives' practices in connection with the payment of bribes and gifts and, more broadly, in the context of the Company's disclosure practices. These violations of the FCPA, which, upon information and belief, is widespread within the Company, could not have occurred without the knowledge of Mr. Hurd and senior management of H-P. Thus, I demand that H-P sue all such executives to recover the damages it has sustained and will sustain as a consequence of such wrongful conduct.

**<u>Antitrust Law Violations:</u>**

It appears that the Company has been victimized by serious violations of the antitrust laws, particularly price fixing conspiracies. Because of the anti-competitive activities of H-P's own executives, you have refrained from taking action to recover the Company's damages from those persons and entities who have caused substantial damages to it. For example, according to a one-count felony charge filed in the United States District Court in San Francisco, Wen-Hung "Amigo" Huang conspired with others to suppress and eliminate competition by fixing the prices of TFT-LCD panels. Huang, a resident of Taiwan and the former director of sales of Chi Mei Optoelectronics Corporation ("Chi Mei"), participated in the conspiracy from on or about September 14, 2001 to on or about December 1, 2006. Under his plea agreement which is subject to court approval, Huang, who was charged on July 28, 2010, has agreed to serve 9 months in jail, to pay a $25,000 criminal fine and to assist the Department of Justice in its ongoing TFT-LCD investigation.

TFT-LCD panels are used in computer monitors and notebooks, televisions, mobile phones and other electronic devices manufactured by the Company. H-P appears to have been directly affected and damaged by the LCD price-fixing conspiracy by Chi Mei and other manufacturers of TFT-LCD panels. By the end of the conspiracy period, the worldwide market for TFT-LCD panels was valued at $70 billion. The Justice Department charged that Huang and through him, Chi Mei, participated in a conspiracy in which the participants met and agreed to charge prices of TFT-LCD panels at predetermined levels. The participants in that

5

conspiracy also issued price quotations in accordance with the agreements reached and exchanged information on the sales of TFT-LCD panels for the purpose of monitoring adherence to the agreed-upon prices. In light of the fact that, as of this date, 18 executives and eight companies have been charged criminally in connection with price fixing in the LCD industry, there is no valid reason for H-P not to sue those companies and their executives that have harmed the Company. Accordingly, I hereby demand that H-P sue the  companies and individuals that have engaged in the foregoing and other price-fixing activities that have damaged the Company.

Upon information and belief, until recently, Mr. Hurd and other senior executives of the Company concealed the underlying details relating to the conduct of H-P management in paying bribes, making kickbacks and paying illegal rebates as described above and otherwise. Such conduct is likely to have further repercussions as the Department of Justice and the SEC investigate H-P further, the ultimate consequences of which are not presently known. I hereby demand that the Company sue Mr. Hurd and each of the other knowledgeable and responsible members of H-P management for their wrongdoing and the damages caused and being caused to the Company as a result thereof.

### The Demands Made:

The demands made herein and the fact that they have been made should not be taken to mean that any of you is independent, dis-interested or can properly and objectively deal with such demands, which you cannot. This letter is being sent solely for the purpose of giving H-P the opportunity to commence the demanded litigation itself in the first instance and to do so promptly. Each of you is personally implicated in the alleged wrongdoing by, *inter alia*, your personal culpability in connection with the wrongdoing alleged above and/or its cover-up. The demands set forth in this letter have been made because, if they had not been, your counsel and/or counsel for the Company would seek to have dismissed any shareholder's derivative litigation that might be commenced in connection with the claims referred to herein had no pre-suit demand been made.

6

I look forward to hearing from you or your counsel within thirty days.

Sincerely yours,

/s/

Richard D. Greenfield

Enclosure

CC:

RDG:gw

Exhibit B

**GREENFIELD & GOODMAN LLC**
**ATTORNEYS AT LAW**
**250 Hudson Street**
**8th Floor**
**New York, NY 10013**
**(917) 495-4446**
**Fax (212) 355-9592**
**email: whitehatrdg@earthlink.net**

**Richard D. Greenfield**
*Also admitted to the Maryland*
*and Pennsylvania Bars*

August 28, 2010

Board of Directors
Hewlett-Packard Company
3000 Hanover Street
Palo Alto, CA 94304

Via FedEx Tracking No. 8710-6420-9086

Dear Members of the Board:

I am writing to you on behalf of my clients, Andrew J. Copeland and Martha J. Copeland, upon whose behalf I sent you the attached letter of August 23, 2010. This letter is intended to supplement and add to the demands set forth in the August 23 letter, which is incorportated herein by reference.

**The Bidding Frenzy for 3PAR:**

In today's <u>Wall Street Journal</u>, columnist Rolfe Winkler states:

> "3PAR might as well have listed itself on eBay, given the frenetic pace of bidding by Dell and Hewlett-Packard
>
> The question for shareholders is whether the two suitors' cavalier approach to valuation means their cash risks being wasted, or whether they are making a sensibly paying up [sic] to protect their markets."

Joseph Menn and Helen Thomas, in today's <u>Financial Times</u> referred to:

1

"...a bidding frenzy prompted by strategic ambitions that pushed the [$30/share] price well beyond ordinary valuations."

It has been reported that, on August 1, 2010, the Company dropped out of the bidding for 3PAR. No reasons were provided to H-P's shareholders but, presumably, you and the Company's advisors determined that the price demanded...then...was unjustified. Now, you are engaged in a "bidding frenzy" that, even if the possible acquisition of 3PAR might have been a rational exercise of your business judgment before August 1, what is now taking place well exceeds such business judgment and amounts to utter irresponsibility on your part.

Whether or not the acquisition of 3PAR goes forward, you are wasting and will have wasted the Company's assets in pursuit of 3PAR. Bloomberg reporter, Katie Hoffmann, quotes analyst Aaron Rakers, who has noted your desire "to show [H-P] can clinch the deal after the departure of its chief executive officer." An ego-driven acquisition of $2 billion or more plus a $72 million "break-up" fee simply makes no sense, as your more considered decision of approximately August 1 would reflect.

Accordingly, whether or not H-P acquires 3PAR, I hereby demand on behalf of my clients that the Company commence litigation against each of you for its damages and the waste of H-P corporate assets in connection with your renewed attempts to acquire 3PAR, all of which amounts to breaches of the fiduciary duties you owe the Company and its shareholders.

## The Demands Made:

The demands made herein and the fact that they have been made should not be taken to mean that any of you is independent, dis-interested or can properly and objectively deal with such demands, which you cannot. Indeed, each of you has personally acquiesced in the 3PAR bidding frenzy that is taking place. This letter is being sent solely for the purpose of giving H-P the opportunity to commence the demanded litigation itself in the first instance and to do so promptly. Each of you is personally implicated in the alleged wrongdoing by, *inter alia*, your personal culpability in connection with the wrongdoing alleged above. The demands set forth in this letter have been made because, if they had not been, your counsel and/or counsel for the Company would seek to have dismissed any shareholder's derivative litigation that might be commenced in connection with the claims referred to herein had no pre-suit demand been made.

2

I look forward to hearing from you or your counsel within thirty days.

Sincerely yours,


Richard D. Greenfield

Enclosure
CC: Ms. Martha J. Copeland
     Mr. Andrew J. Copeland

RDG:gw

Exhibit C

# GREENFIELD & GOODMAN LLC
## ATTORNEYS AT LAW
250 Hudson Street
8th Floor
New York, NY 10013
(917) 495-4446
Fax (212) 355-9592
E-mail: whitehatrdg@earthlink.net

# Richard D. Greenfield
*Also admitted to the Maryland
and Pennsylvania Bars*

July 12, 2013

Board of Directors
Hewlett-Packard Company
3000 Hanover Street
Palo Alto, CA 94304

Via FedEx Tracking No. 8996 7943 3217

Dear Members of the Board:

I am writing to you on behalf of my clients, Andrew J. Copeland and Martha J. Copeland, who presently own, and who have owned continuously since 1999, shares of the common stock of Hewlett-Packard Company ("HP" or the "Company"). A copy of the relevant page and portion of my clients' brokerage statement showing the current ownership of HP shares is enclosed with this letter.

The HP Board, is and has been, dysfunctional for more than a decade. Despite re-constituting itself five times during this period, the Board has remained faction-ridden and has failed to provide for the Company any consistent direction or management oversight.

Since naming Carly Fiorina as Chief Executive Officer ("CEO") in 1999, HP has endured proxy wars with some of the founders' children over the controversial merger of HP with Compaq; continuous in-fighting among Board members culminating in the summary ousting of Fiorina; the use of illegal monitoring tactics and pretexting of suspected Board members; felony charges leveled against the Board Chair and executives; the firing of Mark Hurd for serious misconduct, including, *inter alia,* expense account irregularities involving a female "independent" contractor; the disastrous acquisition of Electronic Data Systems ("EDS") in 2008 for $13.9 billion, of which $8 billion of its value had to be written down (and the subsequent failure of the Board to take any action against those responsible for such debacle, including allowing applicable statutes of limitation to run with respect to such claims); the improper compensation of Mr. Hurd, who sought the EDS deal, of $43 million for fiscal year 2008; the reckless bidding for and ultimate acquisition by HP of 3Par in 2010 for $2.3 billion plus other expenses; the reckless hiring and firing of Leo Apotheker, its third fired CEO in a row; the reckless hiring of Meg Whitman as

1

CEO; and the reckless acquisition of Autonomy Corporation plc ("Autonomy") without due regard to the opinions of HP's own experts and securities analysts, as well as HP's Chief Financial Officer, Catherine A. Lesjak, all of whom determined the price paid by HP was grossly excessive.

According to *The New York Times* of September 21, 2011, Tom Perkins, a former HP Director, stated "It has got to be the worst board in the history of business."

The Company has suffered substantial economic damages and damages to its reputation as a direct result. As Michael Garland, executive director for corporate governance in the New York City Comptroller's office stated, "There's been a long series of boardroom failures that have harmed the reputation of the company and repeatedly destroyed shareholder value over an extended period of time."

These damages were magnified when, on November 30, 2011, Standard & Poor's ("S&P") cut its rating of HP debt, lowering it from single "A" to "BBB" plus. In this substantial downgrade, S&P went on to state as to this formerly "blue chip" company:

> "In addition, we have concerns that HP's inconsistent growth strategies and high levels of board of directors and management turnover have elevated the level of operational and execution risk in the near term."

At the same time, Fitch's also cut HP's ratings, and Moody's lowered HP's credit rating from A3 to Baa1 in November 2012. The downgrades have increased HP's borrowing costs and reduced its capacity to borrow, in addition to further damaging its reputation.

On behalf of my clients, I demand that the Company sue former CEOs, Leo Apotheker and Mark Hurd, former Board members Lawrence Babbio, Sari Baldauf, Joel Hyatt, John Joyce, Robert Ryan, Lucille Salhany, Dominique Senequier, John Hammergren, and Ken Thompson, as well as each of you (Meg Whitman, Raymond Lane, Marc Andreesen, Shumeet Banerji, Rajiv Gupta, Ann Livermore, Gary Reiner, Patricia Russo, Ralph Whitworth) in connection with their conduct as officers and/or directors of HP including, *inter alia,* (1) deceiving the public by failing to disclose material, neutral and non-pejorative facts regarding the mismanagement of the Company's operations and covering up the Company's lack of adequate internal controls, (2) failing to disclose material facts in various proxy statements in order to induce HP shareholders repeatedly to vote at shareholder meetings in favor of the Board's nominees for election and to ratify the appointment of Ernst & Young, LLP ("E&Y"), the Company's outside auditor, despite the fact that E&Y's audits were not carried out in conformity with Generally Accepted Auditing Standards ("GAAS") and were in breach of its contractual obligations to HP; (3) failing to exercise appropriate oversight duties and to take action to remedy the payment of bribes in violation of the Foreign Corrupt Practices Act ("FCPA"), stonewalling investigators of the United States Department of Justice ("DOJ"), the Securities and Exchange Commission ("SEC") and otherwise, despite knowing the Company had committed illegal acts and covering them up, thereby causing substantial harm to HP; (4) permitting the expiration of statutes of limitation applicable to claims possessed by the Company without, *inter alia,* investigating such claims, obtaining agreements tolling the running of such statutes of limitation and otherwise; (5) retaining one or more law firms purportedly to investigate shareholder demands and/or claims by the Company against its officers and directors with the purpose of protecting such persons from liability to HP; (6) violating federal disclosure laws, thereby causing the Company to be sued by defrauded investors in, among other cases, Master File No. C-12-5980 CRB; (7) recklessly

2

pursuing and making acquisitions without adequate investigation and/or paying unjustifiably excessive prices in connection therewith including, *inter alia*, the acquisitions of Autonomy, EDS and 3Par; and (8) failing in their most fundamental stewardship responsibilities owed to HP by, *inter alia*, providing superficial and perfunctory services as directors.

All of such conduct has caused and will continue to cause the Company and its shareholders massive economic damages, including the huge cost of investigating misconduct, implementing remedial measures, defending lawsuits, and substantial decline in shareholder value, and further damage to its reputation and goodwill in amounts which cannot be presently calculated.

Lack of CEO Succession Plan

The SEC issued a legal bulletin in October 2009 declaring that, "one of the board's key functions is to provide for succession planning so that the company is not adversely affected due to a vacancy in leadership." The Company issued a proxy statement on or about February 1, 2011 (the "2011 Proxy Statement"), which contains a description of the Board's purported criteria for assessing the qualification of potential CEO successors, including "strategic vision and leadership, operational excellence, financial management, executive officer leadership development, ability to motivate employees, and an ability to develop an effective working relationship with the Board."

Notwithstanding what is stated in HP's 2011 proxy statement, upon information and belief, the HP Board has had no succession plan in place, nor any serious process to evaluate potential candidates consistent with the foregoing criteria. As explained in the article entitled, "*Corporate Boards and the CEO Selection Process*," by John M. Holcomb, a University of Denver Professor, "Due to a company and governance system in need of repair, HP has been on the search for an outside savior since the selection of Carly Fiorina as CEO. Studies attest to the wisdom of cultivating inside candidates instead, and HP has paid a dear price for continually turning to outsiders."

The revolving door of CEOs has led to tens of millions of dollars in severance payouts and has resulted in HP being relegated to "poster boy" status and a "laughingstock in Silicon Valley" for the failure of corporate governance and the breach of fiduciary duty by members of the Board. As former General Electric CEO, Jack Welch, sharply stated: "They end up blowing up the CEOs and don't have anyone else in mind to come in. Where the hell was the leadership development?"

On a date prior to August 6, 2010, the Board asked for and received the resignation of Mr. Hurd in connection with his highly publicized relationship with Jodie Fisher involving claims of sexual harassment, inappropriate sexual advances and, admittedly, an inappropriate relationship between the participants, including Mr. Hurd's submission of unjustified expense reports related to such relationship and otherwise, and the Company's compensation of Ms. Fisher, as approved by Mr. Hurd, for services and expenses of questionable value and/or which were never rendered. Mr. Hurd was awarded a "going away" gift in cash and HP stock, variously valued at $30-55 million. Rajiv Gupta, John Hammergren, Joel Hyatt, Lucille Salhany, and Lawrence Babbio, who were members of the Board's "HR and Compensation Committee," recklessly agreed to a "separation agreement" that failed to contain a "non-compete" provision. As a result, Mr. Hurd immediately joined Oracle, a leading competitor of HP, as its new Co-President, as of September 6, 2010. The Board then caused HP to commence litigation against Mr. Hurd. As *The New York*

3

*Times* reported on September 10, 2010, the filing of this suit "unwittingly highlights the mistakes it made in the way it let Mr. Hurd go – the H.P. board can now lay claim, officially, to the title of the Most Inept Board in America."

Mr. Hurd had told the Board that no internal candidates, including Todd Bradley, Ann Livermore, Tom Hogan, or David Donatelli, were ready to be CEO. After Mr. Hurd's departure, the Board heeded Mr. Hurd's evaluations, and ruled out the internal candidates, resorting to an interim CEO for two months, CFO Catherine A. Lesjak. The Board appointed Messrs. Babbio, Hammergren, Andreesen and Hyatt to look for a new CEO. They narrowed the choices down to three candidates, and then rushed recklessly into hiring Leo Apotheker, 55 days after Mr. Hurd's dismissal, all the while proceeding recklessly to acquire 3Par during the interim, when HP was without a CEO.[1]

Mr. Apotheker's hiring was a hasty, ill-conceived choice carried out without an interview by the full HP Board or any serious Board consideration of his background, including *inter alia*, his lack of experience in hardware, the business that drives HP's revenue, his leadership problems at SAP Aktiengessel schaft ("SAP"), his most recent employer, and his role in SAP's intellectual property theft of Oracle. Eric Jackson, managing member of Ironfire Capital, stated "Apotheker is the worst CEO hire in the last decade."

After Mr. Apotheker's hiring, Raymond Lane asked Joel Hyatt and John Joyce, the two directors seen as Mr. Hurd's main defenders, to resign from your Board. As a matter of balance, he also told the two directors who led the initial inquiry in the Hurd debacle, Lucille Salhany and Robert Ryan, to depart as well. All four of these directors tendered their resignations and left their positions on January 20, 2011. An "ad hoc committee" was then formed, consisting of CEO Apotheker and Raymond Lane, Lawrence Babbio and John Hammergren, and they chose five director nominees including Mr. Apotheker, Dominique Senequier, who sat on the board of Schneider Electric with Mr. Apotheker, Pat Russo, Gary Reiner, and Meg Whitman, all three of whom had previous business connections to Mr. Apotheker. The Nominating Committee, consisting of Babbio, Baldauf and Thompson, chose two director nominees, namely Shumeet Banerji and Ann Livermore.

Institutional Shareholder Services ("ISS"), a corporate governance research firm, properly criticized Babbio, Baldauf and Thompson for allowing Mr. Apotheker to have a direct role in choosing five new board members, claiming such action violated HP's own internal governance rules and raised "red flags." As the ISS report stated, "Given the problematic board issues that have arisen at the company in the past (including the forced resignation of a former independent chair in 2006), shareholders would have expected the company to adhere to the highest standards of board governance." The ISS recommended that shareholders vote against the re-election of Babbio, Baldauf and Thompson.

On Mr. Apotheker's watch, HP stock fell 47%, or a loss of over $40 billion in the Company's market value. Mr. Apotheker was unceremoniously terminated on September 22, 2011, some 10 months after having taken office. His incompetence and short, tumultuous tenure was generously rewarded by the Board with a severance payout of over $13.2 million, including a fiscal 2011 bonus of $2.4 million for his disastrous 10 months in office, which included his

---

[1] Upon information and belief, the Company's outside counsel fueled the reckless bidding war, which the Board had authorized, while having little understanding of 3Par's intrinsic or strategic value to HP.

reckless advocacy of the Autonomy acquisition. Lawrence Latif, in his August 23, 2012 article entitled "HP's EDS write-off hides deeper problems", published in the *Inquirer*, exclaimed that "Carly Fiorina, Mark Hurd and Leo Apotheker are all names that many HP insiders wish had never set foot in the HP CEO office. While Fiorina and Hurd had many years of mismanagement to grind down HP, Apotheker deserves extra recognition for doing so much damage in such a short time."

Immediately after Mr. Apotheker departed, without having conducted any search, the Board abruptly hired another outsider, Ms. Whitman, as the most recent President and CEO. Although she has no technology industry experience, having worked in consumer companies prior to joining HP, and although she was responsible for the recklessly-made Skype acquisition at eBay, handing shareholders a $2.75 billion loss, Mr. Lane presented his close personal friend as "uniquely qualified." Ms. Whitman, in turn, accepted the position on the condition that Mr. Lane serve as Board chair. Had the Board been more unified and reliable, Ms. Whitman would not have been able to exert such undue influence.

Barely a month into Ms. Whitman's tenure as CEO, HP announced on October 27, 2011 that it would retain the Company's personal computer business, thereby closing off the alternate strategic path offered by her predecessor. Nevertheless, Mr. Apotheker already had irreversibly damaged HP's PC business, in that its revenue continued to decline, as noted by the 10% drop for the third quarter of 2012, and market share fall, while Lenovo is set to overtake HP as the largest PC vendor in what is still a huge market.

As reported in *The Wall Street Journal* of October 30, 2012, Meg Whitman "has repeatedly blamed her predecessors [Hurd and Apotheker] for not investing in research and development as a reason for why H-P is now struggling." She is also directly quoted as admitting that: "We haven't had a new product lineup in seven years…It was very obvious that we had a product gap here." The same article goes on to say that "Ms. Whitman again warned the worst is yet to come for the company. H-P's stock is now trading near a 10-year low." At the time, Ms. Whitman concealed from the public the growing debacle already well-known to her and other Board members from at least May 2012 pertaining to the acquisition of Autonomy.

The incredibly botched Autonomy deal has led to a possible return to Mr. Apotheker's failed strategy to dispose of certain underperforming businesses. Despite Ms. Whitman's announcement in October 2011 that HP would not dispose of its PC business, according to HP's December 27, 2012 Form 10-K filing with the SEC, HP may be considering this option seriously. HP wrote: "We also continue to evaluate the potential disposition of assets and businesses that may no longer help us meet our objectives." This back-and-forth in the decision to spin-off or sell the PC business only further exacerbates the already precipitous decline in the Company's value.

<u>Failed Acquisitions</u>

For the last decade, HP's primary business, computer and related hardware manufacturing, has become stagnant. The Board's purported strategy for transforming the flailing company into a leader in the technology industry through mergers and acquisitions has resulted in a decade-long history of recklessly-pursued acquisitions. As Dane Anderson, IT outsourcing analyst with the Garner research firm, has explained, "HP has had a ready, fire, aim approach to acquisitions…They seem to say: this looks good, let's buy it because we can buy it and we'll

figure out what to do with it later." In so doing, the members of the Board's Finance and Investment Committee, in particular, have repeatedly failed to uphold their fiduciary duties and abide by the Committee's Charter, which requires them to "evaluate the execution, financial results and integration of HP's completed investment, acquisition, enterprise services, joint venture and divestiture transactions."

Beginning in 1999, HP spun off its measurement device unit, which included technologies that were the genesis of HP and the core to its success, to Agilent Technologies. HP's Board tried to re-make the Company with the controversial $25 billion acquisition of Compaq in 2001, increasing HP's presence in the PC business at a time when the industry was becoming low growth and low margin. Ten years later, in August 2012, HP was forced to write down an additional $1.2 billion in its value, having already absorbed substantial writedowns since the Compaq acquisition.

When Mr. Hurd became CEO of the Company, he continued down the path of ill-fated acquisitions. The 2008 acquisition of EDS ended up with a writedown in the third quarter of 2012 of approximately $8 billion due to a goodwill impairment of the $13.9 billion it paid for EDS in 2008, once again after other writedowns had previously been taken. The all-cash, recklessly made acquisition of Palm, Inc. for $1.2 billion in 2010 before Mr. Hurd resigned also proved unsuccessful. Just one year later, in November 2011, HP took a $1.67 billion write-down for Palm.

Immediately following Mr. Hurd's departure, while the Company was without a CEO, on September 27, 2010, HP completed its acquisition of 3Par for $2.3 billion, of which $1.6 billion was subsequently recorded as intangible "goodwill" and $569 million as other intangible assets. HP's offer, which was the culmination of a reckless bidding frenzy in which the Company's outside legal counsel was a principal advisor to the Board, was about ten times 3Par's total revenue over the previous four quarters and was the highest premium offered in a competitive bidding situation of American deals of at least $50 million tracked by Bloomberg since 2001. Bloomberg reporter, Katie Hoffmann, quotes analyst Aaron Rakers, who pointed out the Board's desire "to show [HP] can clinch the deal after the departure of its chief executive officer." In the wake of the public eruption of the Hurd-Fisher scandal on August 6, 2010, HP's Board was particularly mindful of the need to generate publicity for the Company by an event that would generate positive "buzz," hardly a justifiable reason to make an acquisition for $2.3 billion. Although HP has not yet written down large portions of the purchase price paid for 3Par, as it already has for EDS, Palm, and Autonomy, 3Par has been buried in HP's Enterprise, Servers, Storage & Networking ("ESSN") business unit, which has continuously experienced a decline in revenues. Ms. Whitman has admitted that turning around ESSN is not something that can be done quickly. It is anticipated that a writedown of most of 3Pars' $2.3 billion cost is forthcoming.

In March 2011, CEO Apotheker, launched his strategy (devised jointly with Raymond Lane) for fixing HP by spinning off or selling its PC division and buying a large data analytics company. A five-member committee, including Lawrence Babbio, Pat Russo, and Raymond Lane, had studied the options for the PC division, but failed to scrutinize the impact of Mr. Apotheker's plan. They met just twice and did not even consult Todd Bradley, the head of that division. According to a November 30, 2012 *Reuters* report, "Apotheker went on the acquisition trail almost immediately, even though previous HP takeovers like Compaq and Palm had not worked out well."

The very announcement on August 18, 2011 of the plan to buy Autonomy caused HP shares to plunge 20% in one day. In the face of this negative response, Mr. Lane, who had actively pushed the Autonomy deal, sought to blame Mr. Apotheker for the failed new direction. Mr. Apotheker, for his part, tried to ease the minds of shareholders in a September 13, 2011 investor conference call hosted by HP, where he stated falsely, "We have a pretty rigorous process inside HP that we follow for all of our acquisitions, which is a DCF-based model, and we try to take a very conservative view at this. Just to make sure everybody understands, Autonomy will be, on day one, accretive to HP." He continued, "We did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy. And it will give a great return to our shareholders." Mr. Apotheker's comments were intentionally misleading since he knew that, prior to its consummation, the HP Board (and, particularly, Mr. Lane) was intent on closing the Autonomy deal without conducting the level of due diligence necessary for a potential acquisition of such magnitude, particularly after issues had been raised as to the legitimacy of Autonomy's accounting. After all, as John Schultz, HP General Counsel, later admitted, Autonomy did not have well-maintained financial records and, additionally, the Autonomy deal was widely regarded by securities analysts and the business news media as greatly overpriced. Larry Ellison, CEO of Oracle, made public statements in August and September 2011 that Oracle had "taken a pass" on acquiring Autonomy as he believed it was over-valued at $6 billion; the Oracle website posted the power point slides given to Oracle by Mike Lynch, Autonomy's then CEO, which showed Autonomy's revenue and enterprise value, as of January 24, 2011, to be about $5.7 billion, at best.

The HP Board was well aware that there were serious accounting irregularities at Autonomy, specifically questionable revenue recognition practices. Its members also knew or recklessly ignored the fact that the 40-45% operating margins touted by Autonomy did not seem likely given its customer base, and that Autonomy, most likely, operated at 28-30% margins, severely diminishing the value of it, rendering HP's purchase decision a waste of corporate assets. Furthermore, the HP Board was aware that Autonomy's identifiable assets were worth far less than HP's purchase price since HP was required to record $6.6 billion of goodwill and $4.6 billion of amortizable intangible assets, as part of the acquisition. A similar situation had already occurred with the purchase of Palm under Hurd, whereby HP booked a large amount of goodwill and intangible assets, and later was required to write off $3.3 billion. The 3Par acquisition was accounted for predominantly as a purchase of goodwill. Given the substantial overpayments in the acquisitions of Palm and 3Par, both clients of Frank Quattrone, an investment banker in the technology industry well known to the HP Board, the fact that Autonomy also was Mr. Quattrone's client should have caused the Board to be skeptical of the deal. However, both Ms. Whitman and Mr. Andreesen, in particular, were improperly influenced by their close personal relationships with Quattrone, and ignored their fiduciary obligations to HP. On October 3, 2011, HP completed its purchase of Autonomy for more than $11.7 billion, notwithstanding (i) the departure of Mr. Apotheker, who initiated the transaction; (ii) the Company's abandonment of

7

his strategy; (iii) the well-known and still unresolved issues regarding Autonomy's questionable revenue recognition and related accounting practices, of which HP General Counsel, John Schultz, has admitted he was aware; (iv) the over-valuation of Autonomy as compared to similarly-sized companies in the same industry and given that it only reported approximately $250 million in profit annually; and (v) the implacable opposition of Catherine A. Lesjak, the Company's CFO. According to an account in *Fortune* magazine published in May 2012, Ms. Lesjak made an impassioned presentation to the Board and argued that the deal was not in the best interests of shareholders. One person who spoke to her the day the Autonomy acquisition was announced reported that she was afraid she would be fired for being so outspoken.

Once the acquisition was completed, in accordance with Ms. Whitman's directive, representatives of HP, including Ms. Lesjak, Nicole Eagen, and Ms. Whitman, repeatedly have praised publicly the Autonomy acquisition. In particular, they have made numerous statements purporting to justify the astronomical price paid for Autonomy by touting the existence of a supposed groundbreaking product, Next Generation Information Platform IDOL 10, which was claimed to combine the technologies of Autonomy and Vertica, another HP acquisition, and had been available for sale since December 1, 2011. However, to date, no such product exists. Ms. Whitman and the HP Board have purposely misled the public despite knowing from the start that HP grossly overpaid for Autonomy's outdated technology. In May, 2012, the HP Board received direct notice from a whistleblower that Autonomy was plagued by accounting improprieties, a fact that the Board members were already generally aware. A 6-month internal investigation was launched, culminating in the November 20, 2012 announcement that HP was forced to write down goodwill and intangible assets related to Autonomy by $8.8 billion, approximately 80% of the purchase price paid by HP for Autonomy, just one year earlier. Despite the Board's personal knowledge of the pending writedown, this material event was not disclosed to the public between May and October 2012. Such deception violated, *inter alia*, the Board's disclosure obligations under and pursuant to the Securities Exchange Act of 1934 and its members' duties of candor owed to HP and its shareholders. In the wake of such deception, investors sued HP, causing further additional damages to the Company, both to defend such litigation and, ultimately, to resolve it.

During the same time period, in order to artificially support HP's share prices, the Company, under the direction of the Board and Raymond Lane, recklessly approved the repurchasing of 24,053,000 shares of its common stock at an aggregate cost of approximately $489,221,520. After the news broke about Autonomy's true value and its disastrous impact upon the Company, HP's stock plummeted to $12 per share.

While the November, 2012 announcement admitted that "Autonomy was substantially overvalued at the time of its acquisition," Ms. Whitman, in an effort to conceal widespread corporate fraud and mismanagement, has tried to absolve herself and the HP Board and shift the blame for the botched Autonomy acquisition to her predecessor, Mr. Apotheker, and former Chief Technology Officer, Shane Robison, who received over $9 million in compensation in 2011, as well as to Autonomy's former CEO, Mike Lynch, Deloitte LLP (which served as Autonomy's independent auditor prior to and during the acquisition), KPMG International (which, HP now claims, but KPMG denies, was engaged to audit Deloitte's work on Autonomy), and Barclays Capital (which served as the joint financial advisor and corporate broker to HP during the acquisition). As Richard Davis, a partner at RHR International, said, "There was a lot of holding Apotheker accountable for HP's troubles, which is fine. But the board is who has the keys. Who's holding them accountable?"

To make matters worse, HP is funding its reckless acquisitions through a questionable tax evasion scheme. On January 2, 2008, HP devised a "staggered" foreign loan program specifically designed to provide a continuous flow of billions of dollars of offshore profits to the US without paying US taxes. The funding for these loans came mainly from two sources, the Belgian Coordination Center ("BCC") and the Compaq Cayman Holding Corp ("CCHC"). These offshore subsidiaries alternately loaned funds to HP in back-to-back-to-back-to-back 45-day loans. Since the inception of this program, there is never a day that HP does not have an outstanding loan of billions of dollars from one of these foreign subsidiaries.

The lending from these two offshore entities is essential to fund HP's US operations, including payroll expenses, stock repurchases, and acquisitions. Indeed, an HP powerpoint provided to the Senate Permanent Subcommittee on Investigations in September 2012 characterized the loan program as "the most important source of liquidity for repurchases and acquisitions." As attention is drawn to these practices, HP is likely to be assessed substantial taxes, interest and penalties since its senior management and Board (as well as E&Y) have long known or should have known that the repatriated funds are subject to at least federal taxation since they do not meet the timing restrictions and lending entities independence requirements of Section 956 of the Internal Revenue Code.

<u>False and Misleading Proxy Statements</u>

Every year in March, the Company holds an annual meeting of shareholders. Prior to these annual meetings, the Board causes the Company to issue and disseminate a Notice of Annual Meeting and Proxy Statement. Since 2010, HP directors serving at the relevant times, recommended, *inter alia*, that shareholders vote for each of the Board's nominees for election to the Board and for the ratification of the appointment of HP's independent registered public accounting firm, E&Y, all the while omitting material facts bearing upon these issues and impacting materially as to how the shareholders of the Company would vote thereupon.

Every HP proxy statement since 2010 contains essentially the same paragraphs describing the supposed process by which director nominees were considered and evaluated, as well as short recitations of the jobs and directorships held by nominees, and membership listings of each of the Committees of the Board in the prior year. There is no description of crucial actions (and/or material inactivity) taken by these Committees, the manner of selection of nominees, or other vital information regarding the professional competence, accountability and effectiveness of each of HP's directors. For example, there is no mention of the fact that HP Board's Finance

9

Committee, chaired by John Hammergren, and consisting of Joel Hyatt, Lawrence Babbio, and Ken Thompson, authorized HP's interim management to engage in a "bidding frenzy" in its acquisition of 3Par. Nor was it ever disclosed that the HP Board's Technology Committee ignored the fact that Palm's mobile device product, at the time of Palm's acquisition, was failing as it could not compete with the likes of Apple and Google. Other than tracking each director's purchases and sales of HP stock, the Board made no serious evaluation of director nominees or sitting directors, particularly in terms of their performance and effectiveness. The fact that HP's 2013 proxy statement reads like every previous proxy statement is the most glaring example of the foregoing and other material omissions. The proxy statement fails to mention the role various directors played in the EDS debacle. There is no mention of the tens of thousands of job cuts and multiple changes in management of the services division since EDS was acquired. As Lawrence Latif explained in his article entitled, "HP's EDS write-off hides deeper problems," published in the *Inquirer* on August 23, 2012, "for an established business such as EDS to be overvalued by almost $10bn just four years after being acquired is nothing short of gross incompetence by HP in both the purchase and the subsequent handling of the firm once it became a part of HP."

Likewise, the 2013 proxy statement does not mention the most material facts bearing upon the circumstances under which the HP Board approved the Autonomy acquisition. Had the HP Technology Committee (Ms. Whitman, Mr. Andreesen, Mr. Reiner, Ms. Russo) met more than once to discuss Autonomy, and reviewed a few industry reports, they would have discovered that Autonomy's Intelligent Data Operating Layer 7 database program was not user-friendly, had not been updated in five years, and was no longer competitive. Similarly, directors Ken Thompson, Lawrence Babbio, Sari Baldauf, and Shumeet Banerji, the "audit committee financial experts," just had to glance at Autonomy's publicly reported balance sheets, and they would have noticed that Autonomy's reported receivables of $330 million, as compared to reported total sales of $870 million, were not credible. These Committees' conscious disregard of "red flags" was an obfuscation of their fiduciary duties to HP and its shareholders and reflected the relatively modest amount of time devoted to HP's business, particularly by its non-management directors. For example, director Hammergren, CEO of McKesson Corp., who was compensated by it more than $130 million in 2011 and $355 million in the seven years ended March 2013 according to the June 25, 2013 *Wall Street Journal*, devoted himself well in excess of full-time to McKesson and relatively little to HP. Despite HP's massive governance and operational problems, each of HP's non-management directors was similarly preoccupied elsewhere.

Had the Board disclosed, *inter alia,* material facts regarding the circumstances of the Autonomy and EDS acquisitions, as well as other failed initiatives, the roles of certain Board members in these failed acquisitions, and the involvement of long-serving directors and/or those in leadership positions on the key committees in serious oversight failures, some or all of the nominees for directors may well not have been elected.

While the Board need not criticize itself, it nevertheless could have and should have provided to HP shareholders neutral material facts in non-pejorative terms describing its members' conduct. Nevertheless, in connection with each of the Company's recent proxy statements, the then-sitting Board failed to make such disclosure.

The Board, in the Company's 2013 proxy statement, failed to disclose, *inter alia*, the existence of and circumstances relating to HP's $18 billion in acquisition writedowns in fiscal 2012. Neither did the Board disclose the fact that these writedowns stem from the Board's own

approval of the acquisitions. Such facts, among others, were material to the issues put before HP's shareholders for votes at the 2013 annual meeting.

As is disclosed in HP's proxy statements, the members of its Board receive lucrative compensation for serving as directors, as well as fees for their committee assignments, and attendance at meetings, which, in the aggregate, amount to millions of dollars per year. Given the serial debacles the Company has encountered over the years, each of HP proxy statements should have disclosed the specific neutral facts relating to each nominee's performance and specific activities so that shareholders could make their own informed decisions as to whether or not they warranted re-election to the Board.

Additionally, each of the Company's proxy statements purports to disclose the existence of all of the HP Board's "standing committees," the identities of their members, and their respective purposes. The 2010 and 2011 Proxy Statements mention the following six standing committees: (1) Audit; (2) Finance and Investment; (3) HR and Compensation; (4) Nominating and Governance; (5) Public Policy; and (6) Technology. The 2012 Proxy Statement states that the Public Policy Committee was dissolved on March 24, 2011, leaving the HP Board with, purportedly, five standing committees.

No HP proxy statement has referenced the "Special Litigation Committee" (or the various iterations of it), as well as the so-called "Independent Committee" purportedly formed to investigate certain shareholder demands made upon the Board in 2010, and its predecessor, the Ryan-Salhany "Special Committee." Each of these *de facto* "standing committees," however named from time-to-time, was charged by the full HP Board with, *inter alia*, in one form or another, addressing and/or investigating and/or appearing to investigate repeated acts of mismanagement and serious misconduct on the part of HP Board members and senior management. The fact that the HP Board felt it necessary over a multi-year period to have in place standing committees of the HP Board to address material wrongdoing by senior officers and the HP Board, was and is of the utmost materiality in HP shareholders' ability to understand the long-term failings of the HP Board and, ultimately, how to vote upon the Board's voting recommendations in connection with the Company's annual meetings.

The HP Board repeatedly has opined that the Company's internal controls over financial reporting were adequate, as attested to annually by E&Y, despite the fact that the Company's internal controls were routinely circumvented in order to perpetrate the unlawful activities alleged herein in contravention of GAAP and in violation of, *inter alia*, the FCPA. Indeed, given the widespread and global bribery in which the Company's management was engaged but still not acknowledged by the Board, known to Mr. Hurd and Ms. Lesjak, among others, for many years, and the known pattern of false recording of business expenses by Mr. Hurd, it should have been obvious to E&Y and the Board's Audit Committee, which is required to "review the adequacy and effectiveness of HP's internal controls" and even HP's entire Board, that the Company's internal controls were materially deficient and displayed significant weaknesses.

On or about May 23, 2013, the United States regulator of public accounting firms, the Public Company Accounting Oversight Board ("PCAOB") concluded in a damning report that E&Y had been fundamentally lax in its audits of public companies. Even after having been warned repeatedly by the PCAOB, E&Y failed to "clean up its act" regarding the "sufficiency, rigor and efficacy" of the work done by its auditors, all of which resulted in the public release of the PCAOB's previously confidential criticism.

E&Y repeatedly breached its contractual and professional obligations to perform its audits of the Company's financial statements in conformity with GAAS, which E&Y was obligated to do pursuant to the terms of its annual engagements by HP. Such breaches by E&Y were never disclosed by means of non-pejorative, neutral facts, in any of the Company's proxy statements even though the information would be highly significant to HP shareholders casting their votes as to the retention of E&Y as HP's auditor. The repeated selection and ultimate ratification of E&Y as HP's auditor by the Company's shareholders for 2010-2013 causes and caused HP and all its shareholders economic harm since, *inter alia*, E&Y is being and was paid by HP millions of dollars in fees (*i.e.*, $45.7 million for the 2010 audit, $44.4 million for the 2011 audit, and $45.4 million for the 2012 audit) for audits that were not conducted in accordance with GAAS.

On behalf of our clients, I demand that the Board cause HP to issue and disseminate to the Company's shareholders a corrective proxy statement while concurrently making appropriate disclosure of the Board's failures to make adequate and legally required disclosures in the Company's 2013 proxy statement. To the extent that it does not issue and disseminate a corrective proxy statement for the Company's 2014 annual meeting, on behalf of our clients, I hereby demand that HP sue each member of the then-sitting Board for injunctive relief and to recover HP's damages in connection therewith.

## Bribery, Kickbacks and Illegal Rebates

Far more serious than the Hurd-Fisher scandal, as you well know, is the fact that current and former HP officers and other executives in HP's German and Russian offices paid more than $10 million in bribes, in violation of the FCPA, in an attempt to obtain a $47.3 million contract to supply computer equipment and related software to the Russian Prosecutor General's office. Under the supervision of Mr. Hurd and certain of HP's lawyers, the Company initially "stonewalled" the SEC, the DOJ and other investigative bodies. On August 30, 2012, three HP executives were criminally indicted in Germany. As disclosed in HP's first quarterly report in 2013, the German government asked that the Company be named in the bribery case, exposing it to potential disgorgement of profits and other penalties.

In light of the foregoing conduct, "stonewalling" and concealment of such conduct by Mr. Hurd and other culpable executives, and the passivity of the Audit Committee, including directors Baldauf, Joyce, Salhany, Thompson, and Ryan, the Company has been required to pay and will continue to pay substantial legal and other expenses. The Company has yet to disclose whether and/or the extent to which its legal counsel are participating in negotiations with the SEC, the DOJ and other investigative bodies. Further, as a result of these violations of the FCPA and other laws, the Company is likely to be penalized substantially by the SEC, the DOJ and other governmental agencies in amounts which cannot presently be estimated but which are likely to be substantial, all of which facts are material to HP's shareholders. By way of intentional avoidance of full and fair disclosure, the Company's Form 10-Q Report of June 6, 2013 merely states in the most general and obfuscatory language:

> "Under the FPCA, a person or an entity could be subject to fines, civil penalties of up to $500,000 per violation and equitable remedies, including disgorgement and other injunctive relief. In addition, criminal penalties could range from the greater of $2 million per violation or twice the gross pecuniary gain or loss from the violation."

12

Although such widespread violations of the FCPA and the magnitude of the Company's financial exposure have been long-known by HP's Board, as well as the wrongful failure to acknowledge these violations of law in order to mitigate the Company's exposure, the Board and senior management continue to remain silent. The culpable executives and the responsible members of the Board including directors Hurd, Baldauf, Joyce, Salhany, Thompson, and Ryan should be required to pay personally any fines or penalties that are sought against HP as a result of their illegal conduct and its concealment. To the extent any statutes of limitation applicable to the Company's FCPA violations and/or the cover-up and "stonewalling" that took place in connection therewith, were allowed to run which precludes the Company from pursuing legal claims against culpable officers and/or directors, and such inaction was the result of the failure of the Board to even consider such claims, each of them in office has wasted HP's assets and breached his or her fiduciary duties to the Company. Similarly, to the extent that the Board gave no consideration to obtaining tolling agreements from the culpable executives or directors, its members have similarly wasted HP's assets and breached their fiduciary duties.

The Demands Made

On August 23 and 28, 2010, I wrote to you on behalf of my clients ("2010 Demand Letters") demanding that, *inter alia*, the Board cause HP to commence suit against Mr. Hurd and others with respect to detailed misconduct. After initially appointing a committee of directors to investigate certain specified wrongdoing by Mr. Hurd, in purported response to the 2010 Demand Letters, the Board appointed a so-called "Independent Committee" to investigate the claimed wrongdoing and to recommend to the Board whether to pursue the demanded litigation. The "Independent Committee" and the purported "investigation" in its name conducted by the Dechert law firm were not carried out in good faith but were merely a strategy concocted by HP's in-house and outside counsel to provide a means to whitewash egregious wrongful conduct and to provide a means to seek the dismissal of any potential shareholder derivative suit that might be commenced by our clients or others. Indeed, the Board, the "Independent Committee" and HP's legal counsel caused substantial sums to be paid to Dechert wrongfully, against HP's best interests, and for which the Company received no benefit. Accordingly, on behalf of our clients, I hereby demand that the Company commence litigation against those responsible for causing such sums to be wasted and to seek their recovery from Dechert as well.

Although this letter demands that you cause the Company to sue yourselves and several of your former colleagues on the Board, my client does not concede your independence for all purposes or going forward (see *Scattered Corp. v. Chicago Stock Exch.*, 701 A.2d 70 (Del. 1997) ). Rather, my client is simply giving the Board the initial opportunity to cause HP to commence the demanded litigation itself. Obviously, the Board's previous rejection of the 2010 Demand Letters and the manner in which they were handled, as indicated above and in the proposed Third Amended Complaint filed in *Copeland v. Lane, et al.* CASE NO.: CV-11-01058 (N.D.Cal.), showed that the Board and the members of its so-called "Independent Committee" did not address those earlier demands in good faith and in the best interests of HP. Should you follow a similar path with respect to this letter, whatever argument you would make that in making the demands herein, my client has conceded the Board's independence, will be negated.

In sending you this letter and providing the Board with the first opportunity to cause HP to commence the demanded litigation, we recognize that the demands are likely to be rejected in whole or in part, directly or constructively. Should these demands be rejected, as seems most likely given the Board's conduct in the past, our clients have authorized the commencement of

derivative litigation on HP's behalf.  In such event, we are prepared to discuss with HP's counsel various means pursuant to which the prosecution of the Company's claims derivatively will not assist those who are concurrently suing HP for damages such as in the consolidated securities fraud class action, (Master File No. C-12-5980 CRB).  In that regard, during the pendency of any such litigation, our clients will only pursue discovery which does not cause HP or witnesses allied with it to provide testimony/evidence that will potentially cause harm to HP's best interests.

I look forward to hearing from you or your counsel within thirty days.

Sincerely yours,

Richard D. Greenfield

Enclosure

CC: Mr. Andrew Copeland
     Ms. Martha J. Copeland
     Steven Schatz, Esq.
     Marc J. Sonnenfeld, Esq.
     Garrett J. Waltzer, Esq.
     Jonathan C. Dickey, Esq.

RDG/gw

14

Statement for the Period June 1, 2013 to June 30, 2013

J COPELAND



## HOLDINGS > EQUITIES *continued*

| Description | Symbol/Cusip Account Type | Quantity | Price on 06/30/13 | Current Market Value | Estimated Annual Income | Total Cost Basis | Unrealized Gain (Loss) |
|---|---|---|---|---|---|---|---|
| HEWLETT-PACKARD CO DE | HPQ | 240 | $24.80 | $5,952.00 | $139.39 | | |
| Estimated Yield  2.34% | CASH | | | | | | |
| Dividend Option Cash | | | | | | | |
| Capital Gain Option Cash | | | | | | | |
| Next Dividend Payable: 07/03/13 | | | | | | | |

**Total Equity**

**Total Equities**

PROTECTED INVESTORS OF AMERICA

Account carried with National Financial Services LLC. Member NYSE. SIPC.

Exhibit D

# GREENFIELD & GOODMAN LLC
## ATTORNEYS AT LAW
### 250 Hudson Street
### 8th Floor
### New York, NY 10013
### (917) 495-4446
### E-mail: whitehatrdg@earthlink.net

**Richard D. Greenfield**
*Also admitted to the Maryland
and Pennsylvania Bars*

January 6, 2014

Board of Directors
Hewlett-Packard Company
3000 Hanover Street
Palo Alto, CA 94304

Via FedEx Tracking No. 8731-8307-0220

Dear Members of the Board:

I am writing to you on behalf of my client, Andrew J. Copeland, who presently owns, and who has owned continuously since 1999, shares of the common stock of Hewlett-Packard Company ("HP" or the "Company"). This letter is being sent to you as a follow-up to my letter to you dated July 12, 2013 ("Demand Letter"), to which letter I have had no response from you.

Although I have not even had the courtesy of a response to the Demand Letter, I am aware, however, that the law firm of Proskauer, LLP has been expending substantial time and money in investigating a sub-set of the claims made in the Demand Letter; i.e. those arising from HP's reckless acquisition of Autonomy Corporation, plc ("Autonomy") and its ultimate write-off of most of the purchase price.

Such investigation is, presumably, being conducted on behalf of a committee of the Board. While I cannot comment at this point as to the *bona fides* of such investigation or the committee's members, presumably the investigation will

1

be completed shortly. However, as to the remaining claims made in the Demand Letter, I can only conclude that they have been constructively rejected.

With respect to the claims arising from HP's acquisition of Autonomy set forth in the Demand Letter, I recognize that it may not be in HP's best interests at this point for the Company to pursue claims directly against the principal actors, including HP's own officers, directors, "experts" and others (including the officers and directors of Autonomy) that have been implicated in this debacle or for HP shareholders to actively pursue these claims derivatively on behalf of the Company.

As such, to the extent that our client commences suit derivatively and includes claims related to Autonomy, he will only pursue those claims through document requests and/or in proceedings pursuant to 8 Del. C. §220 ("§220"), pending the ultimate resolution of any claims the Company is actively pursuing itself against any of the foregoing potential defendants and the resolution of any related claims where HP is a defendant, such as claims by defrauded investors (e.g. In re HP Securities Litigation Master File No. C 12-5980 CRB (N.D.Cal.)).

Similarly, to the extent that the claims being investigated by the Securities Exchange Commission ("SEC") and Department of Justice ("DOJ") arising out of the Company's payment and cover-up of the payment of bribes in violation of, *inter alia,* the Foreign Corrupt Practices Act ("FCPA"), should our client either succeed in his present appeal to the 9th Circuit or commence a new suit alleging claims based on FCPA violations, obfuscation and cover-up, he will only pursue those claims through document requests or through §220, pending the ultimate resolution of any SEC, DOJ or other investigations of the Company's conduct related to its FCPA violations.

Sincerely yours,

Richard D. Greenfield

CC: Mr. Andrew Copeland

Steven Schatz, Esq.
Marc J. Sonnenfeld, Esq.
John Schultz, Esq.
Jonathan C. Dickey, Esq.
Ladan Stewart, Esq.
Allen J. Ruby, Esq.
Richard S. Horvath, Jr., Esq.
Amy Wintersheimer Findley, Esq.
Dwight L. Armstrong, Esq.
Keith P. Bishop, Esq.
Lawrence D. Lewis, Esq.
Boris Feldman, Esq.
Brian Danitz, Esq.
Bryan J. Ketroser, Esq.
Diane Leslie Webb, Esq.
Franklin B. Gowdy, Esq.
Jill Marie Baisinger, Esq.
Karen Pieslak Pohlmann, Esq.
Katherine Leigh Henderson, Esq.
Kimberly A. Kane, Esq.

RDG:gw

3

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

A. J. COPELAND, etc.      :
              :
Plaintiff,          :
              :
    v.         :
              :  Civil Action No.
              :
LEO APOTHEKER, et al     :
              :
Defendants        :
    and         :
              :
HEWLETT-PACKARD COMPANY :
              :
Nominal Defendant.      :

## <u>VERIFICATION</u>

I, A.J. Copeland, hereby declare and verify as follows: I am the plaintiff in the above-captioned case. I have read the contents of the foregoing Complaint. I am informed and believe that the facts related therein are true, based upon facts as related to me by my counsel, and on that ground, I verify that the facts stated therein are true.


A.J. Copeland  _____